# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **HOWARD ROBINSON, Individually and as Administrator of the Estate of Tiffany Robinson, deceased,** *et al.*, | : | **CIVIL ACTION** |
| | : | |
| | : | **NO. 24-0055** |
| *Plaintiffs* | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PHILADELPHIA HOUSING AUTHORITY,** *et al.* | : | |
| *Defendants* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                                                    JANUARY 15, 2025

## MEMORANDUM OPINION

**INTRODUCTION**

This civil rights action arises out of the tragic deaths of twelve individuals, including several children, following a horrific fire at a residential apartment building owned and managed by the Philadelphia Housing Authority. The fire was started after an autistic five-year-old boy, troubled by an insect infestation in the building, attempted to exterminate the infestation himself by lighting on fire bugs crawling on his Christmas tree.[1] There were no working smoke detectors in the building at the time, a fact allegedly known to some of the named defendants who are employees of the City of Philadelphia and/or the Philadelphia Housing Authority. Because of the lack of working smoke detectors, the occupants of the building were not alerted to the fire until it was too late.

Plaintiff Howard Robinson ("Plaintiff Robinson") is the lone survivor of the fire and the Administrator of the estates of Tiffany Robinson, Taniesha Robinson, Dekwan Robinson, and

---

[1] Though these facts pertaining to the cause of the fire are set forth in Plaintiffs' response to the underlying motion to dismiss, they do not appear in the operative complaint.

J'kwan Robinson (collectively, "Decedents," and with Plaintiff Robinson, "Plaintiffs"). Plaintiff Robinson filed this action under 42 U.S.C. § 1983 against the City of Philadelphia (the "City"), the City's employee, Nadine Fulton ("Defendant Fulton") (together with the City, the "City Defendants"), the Philadelphia Housing Authority, and several of its employees[2] for violation of Plaintiffs' substantive due process rights.

Before this Court is the City Defendants' motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), in which the City Defendants seek the dismissal of the two claims asserted against them (Counts III and IV), on the basis that Plaintiffs have not alleged facts sufficient to meet their pleading burden on each claim. (ECF 8). Plaintiffs oppose the motion. (ECF 11).[3] The issues raised in the motion have been fully briefed and are ripe for disposition. For the reasons set forth, the City Defendants' motion to dismiss is granted as to Count IV and denied as to Count III.

**BACKGROUND**

When ruling on a motion to dismiss, this Court must accept as true all factual allegations in the operative complaint and construe the facts alleged in the light most favorable to the plaintiff. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)). The facts relevant to the underlying motion and alleged in the amended complaint are as follows:

> The Philadelphia Housing Authority (the "PHA") acquired the property located at 869 North 23rd Street, Philadelphia, Pennsylvania (the "Property") in 1967. At the time, the Property was a single-family dwelling. The PHA converted the Property to a two-unit apartment comprised of Unit A (first floor) and Unit B (second and third floors). Unit B has four bedrooms, a kitchen, living room, and is

---

[2]    Plaintiffs' claims against the Philadelphia Housing Authority and its employees are not the subject of this memorandum opinion.

[3]    This Court has also considered the City Defendants' reply. (ECF 12-1).

approximately 1,600 square feet. Unit B's living room and kitchen are on the second floor, and its four bedrooms are on the third floor.

On May 17, 2011, Vanessa McDonald signed a lease with the PHA to rent Unit B for herself and five of her children and grandchildren. By 2022, the McDonald family had fourteen family members living the four-bedroom Unit B. The PHA has restrictions regarding the number of occupants that may live in a PHA-operated unit. Pursuant to these restrictions, a four-bedroom unit may have no more than eight (8) occupants.

The Department of Human Services ("DHS") is an agency of the City of Philadelphia that exists, *in part*, to provide child welfare and juvenile justice services with a goal to provide and promote safety, permanency, and well-being for children. In December 2021, DHS received a report regarding a child occupant of Unit B missing a dental appointment. Following the report, DHS social worker, Defendant Fulton, conducted home safety visits on December 10 and December 21, 2021. During her December 10, 2021 visit at Unit B, Defendant Fulton noticed that the smoke detectors were inoperable and concluded that they were inoperable due to dead batteries. Virginia McDonald stated that she would purchase new batteries before Defendant Fulton's next visit.

On December 21, 2021, Defendant Fulton conducted a second safety visit. During that visit, Defendant Fulton noted that the smoke detectors were checked again and, although batteries were present, the devices were still inoperable. She then represented to the occupants of Unit B that she would obtain and return with working smoke detectors. Between December 21, 2021, and the deadly fire on January 5, 2022, Defendant Fulton never brought the promised smoke detectors to Unit B.

On January 5, 2022, a fire broke out in Unit B. Fire and smoke spread throughout Unit B which resulted in the deaths of DeKwan Robinson, Destiny McDonald, Janiyah Roberts, J'Kwan Robinson, Natasha Wayne, Quintien Tate-McDonald, Quinsha White, Rosalee McDonald, Shaniece Wayne, Taniesha Robinson, Tiffany Robinson, and Virginia Thomas. Plaintiff Robinson, who was able to escape, suffered multiple injuries. At the time of the fire, there were no operable smoke detectors in Unit B.

**LEGAL STANDARD**

Federal Rule of Civil Procedure ("Rule") 12(b)(6) governs motions to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion, the court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Fowler*, 578 F.3d at 210–11. The court must determine "whether the facts alleged

3

in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679). The complaint must do more than merely allege the plaintiff's entitlement to relief; it must "show such an entitlement with its facts." *Id.* (internal quotation marks and citation omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)) (alterations in original).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must allege facts sufficient to "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

**DISCUSSION**

In the operative amended complaint, Plaintiffs assert two civil rights claims against the City Defendants pursuant to 42 U.S.C. § 1983: at Count IV — a state-created danger claim against the City and Defendant Fulton premised on Defendant Fulton's alleged failure to follow through on her promise to replace the inoperable smoke detectors; and at Count III — a *Monell* claim against the City premised on the City's alleged failure to promulgate adequate policies and procedures for ensuring the safety of children in homes under the auspices of DHS and the City's failure to train its employees with respect to the same. The City Defendants move to dismiss both claims. The parties' respective arguments with respect to these two claims are addressed below.

*Plaintiffs' State-Created Danger Claims*
*Against the City Defendants (Count IV)*

At Count IV, Plaintiffs assert § 1983 civil rights claims against the City Defendants under the state-created danger theory. The City Defendants argue that these claims should be dismissed because Plaintiffs have not alleged facts sufficient to support, *inter alia*, the requisite affirmative conduct. This Court agrees.

Section 1983 enables plaintiffs to bring civil actions against any person who, acting under the color of state law, deprives another of rights, privileges, or immunities secured by the Constitution and/or laws of the United States. 42 U.S.C. § 1983. The statute does not confer rights on individuals; rather, it serves as a vehicle "for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393–94 (1989). For a defendant to be liable under § 1983, there must be an underlying violation of the plaintiff's constitutional rights, the defendant must be personally involved in that violation, and that defendant must have acted "under color of state law." *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002). A municipal body is considered a "person" which can be liable under § 1983, but only for its own acts. *Monell v. New York Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

Here, Plaintiffs assert that the City Defendants violated Plaintiffs' Fourteenth Amendment due process rights when Defendant Fulton took and/or failed to take certain action that ultimately resulted in the fire that caused Plaintiff Robinson's injuries and Decedents' deaths. The Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. While courts recognize that the Due Process Clause protects an individual's interest in his or her bodily integrity, the Constitution imposes no affirmative duty on state actors to protect citizens from the acts of private individuals. *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195-96 (1989); *Mears v. Connolly*, 24

F.4th 880, 883 (3d Cir. 2022) ("The government has no general legal duty to keep people safe."); *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008) ("[T]he Due Process Clause does not impose an affirmative obligation on the state to protect its citizens."). This is because the purpose of the Due Process Clause is "to protect the people from the State, not to ensure that the State protected them from each other." *DeShaney*, 489 U.S. at 196.

The United States Court of Appeals for the Third Circuit (the "Third Circuit") found that *DeShaney* "stands for the harsh proposition that even though state officials know that a person is in imminent danger of harm from a third party, the fourteenth amendment imposes upon those state officials no obligation to prevent that harm." *Horton v. Flenory*, 889 F.2d 454, 457 (3d Cir. 1989). Notwithstanding, the Third Circuit has also held that a state may be liable for its failure to protect citizens against injuries inflicted or caused by private actors when the state "affirmatively places the person in a position of danger the person would not otherwise have faced." *Kamara v. Att'y Gen.*, 420 F.3d 202, 216 (3d Cir. 2005).

To state a claim under the so-called *state-created danger theory*, Plaintiffs must plead facts sufficient to plausibly show the following elements:

> (1) the harm ultimately caused was foreseeable and fairly direct;
>
> (2) a state actor acted with a degree of culpability that shocks the conscience;
>
> (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006) (internal quotation marks and citations omitted). A plaintiff must plead facts sufficient to support all four of these elements. *Phillips*, 515 F.3d at 235.

Here, the City Defendants argue that the facts alleged in Plaintiffs' amended complaint fail to satisfy the second and fourth elements. As set forth below, this Court finds that Plaintiffs have failed to plead facts sufficient to support the requisite affirmative action required to satisfy the fourth element. Therefore, it will limit its analysis to this element. *See id.* (explaining plaintiff's failure to sufficiently plead the fourth element "obviates the need to analyze the other three elements").

The fourth element requiring an affirmative conduct by defendants "is typically the most contested . . . because of the inherent difficulty in drawing the line between an affirmative act and a failure to act." *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 242 (3d Cir. 2016). This element requires a plaintiff to allege facts to establish that state actors "used their authority to create an opportunity that otherwise would not have existed." *Kneipp v. Tedder*, 95 F.3d 1199, 1208 (3d Cir. 1996). "It is misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause." *Bright*, 443 F.3d at 282. In other words, "[l]iability under the state-created danger theory is predicated upon the states' affirmative acts which work to the plaintiffs' detriments in terms of exposure to danger." *D.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1374 (3d Cir. 1992). To satisfy this fourth element, a plaintiff must also allege facts to establish "a direct causal relationship between the affirmative act of [each individual defendant] and [the plaintiff's] harm." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 432 (3d Cir. 2006) (explaining that "the fourth element is satisfied where the state's action was the 'but for cause' of the danger faced by the plaintiff").

In *Ye v. United States*, the Third Circuit subdivided the affirmative conduct requirement into three conditions. 484 F.3d 634, 639 (3d Cir. 2007). "The three necessary conditions to satisfy the fourth element of a state-created danger claim are that: (1) a state actor exercised his or her authority, (2) the state actor took an affirmative action, and (3) this act created a danger to the citizen or rendered the citizen more vulnerable to danger than if the state had not acted at all." *Id.* The first condition's authority language is simply a reiteration of the state actor requirement for all § 1983 claims. *Id.* at 640. The affirmative act requirement of the second and third conditions necessitates an act that "amount[s] to a 'restraint of personal liberty' that is 'similar' to incarceration or institutionalization." *Mears*, 24 F.4th at 886 (quoting *Ye*, 484 F.3d at 640-41).

In *Ye*, the Third Circuit applied these principles to determine whether a publicly employed medical doctor's assurances that "there is nothing to worry about" and that the plaintiff need not seek medical assistance were affirmative acts. 484 F.3d at 640. While a state actor's assurances can expose a plaintiff to more harm by causing him to rely on those assurances, the Third Circuit found that such reliance is not a cognizable restraint of liberty under the Due Process Clause and, therefore, "cannot be used as an end run around *DeShaney*'s core holding." *Id.* at 642 (quoting *Rivera v. Rhode Island*, 402 F.3d 27, 30 (1st Cir. 2005)). As such, the Third Circuit concluded that a doctor's assurances could not constitute a deprivation of liberty and held that "a mere assurance cannot form the basis of a state-created danger claim." *Id.* at 640, 642; *see also Mears*, 24 F.4th at 884 ("[A]ssurances and failures to warn are not affirmative acts."); *Bright*, 443 F.3d at 284 (rejecting argument that government assurances to help—even when relied upon—were sufficient to constitute an affirmative act and explaining that under *DeShaney* "no affirmative duty to protect arises from the State's expressions of intent to help an individual at risk.").

In *Morrow v. Balaski*, the Third Circuit provided further guidance for distinguishing "affirmative acts" from non-actionable "omissions" in the state-created danger context. 719 F.3d 160 (3d Cir. 2013). There, the plaintiffs alleged that school authorities permitted a criminally adjudicated delinquent to return to school after serving a suspension for assaulting two fellow students. *Id.* at 164. Upon her return, school authorities allowed the delinquent student to board a bus on which one of the two students she had previously assaulted was riding. *Id.* The plaintiffs argued that the school created a danger by affirmatively permitting the delinquent student to return to school rather than expelling her. *Id.* at 179. Rejecting the plaintiffs' argument, the Third Circuit held that plaintiffs could not satisfy the fourth prong of the state-created danger exception by simply recasting the omissions upon which the claims were based as affirmative acts. *Id.* "[M]erely restating the Defendants' inaction as an affirmative failure to act does not alter the passive nature of the alleged conduct." *Id.*

Here, in the operative amended complaint, Plaintiffs allege the following purported affirmative conduct by the City Defendants (through the acts of Defendant Fulton) with respect to the inoperable smoke detectors:

96. Defendant Fulton conducted home safety visits on December 10, 2021, and December 21, 2021.

97. During her December 10, 2021 safety visit at Unit B, Defendant Fulton noticed that the smoke detectors were inoperable and concluded that they were inoperable due to dead batteries. Her note from that visit states that the smoke detectors were without batteries. Virginia McDonald stated she would purchase new batteries before Defendant Fulton's next visit.

\* \* \*

99. On December 21, 2021, Defendant Fulton conducted a second safety visit. During that visit, Social Worker Fulton noted that the smoke detectors were checked again and, although batteries were present, the devices were still operable:

9

> **2. Safety Assessment, Decision and Plan (what actions occurred and why) :**
>
> The children appeared to be safe and well cared for during this visit. The home remained appropriate. SW will complete the PHMC application with Mother during the next visit for bedding. The children continue to sleep on the couches/floor. The smoke detectors were checked again. The batteries were present, but the device were still inoperable. The batteries were removed and inserted again without evidence of them working. It is uncertain if it were the batteries or the device itself that wasn't working. SW reported that she would bring new devices during the next visit.

\* \* \*

101. On December 21, 2021, Defendant Fulton affirmatively represented to the occupants of Unit B that she would obtain and return with working smoke detectors.

\* \* \*

189. City Defendants, acting under color of state law, through the conduct alleged above, affirmatively exercised their authority in a manner that created a danger to Plaintiff and Plaintiffs' Decedents and/or used its authority in a way that rendered Plaintiff and Plaintiffs' Decedents more vulnerable to danger than had Defendant Fulton not acted at all. Such conduct included:

   a. confirming that the smoke detectors were inoperable;

   b. promising to return with operable smoke detectors to replace the inoperable smoke detectors; and

   c. requiring and allowing Plaintiff and Plaintiffs' Decedents to reasonably rely upon the representation that Social Worker Fulton would return with operable smoke detectors.

(Am. Compl., ECF 6, at ¶¶ 96, 97, 99, 101, 189).

Like many of the plaintiffs in the long line of Third Circuit cases rejecting state-created danger claims, Plaintiffs here attempt to characterize their claims as being based on the City Defendants' "affirmative[] exercise[] [of] authority." A fair reading of the amended complaint, however, demonstrates otherwise. At the heart of each of the above allegations is the mere assurance or "promise" of Defendant Fulton that she would return to the apartment with operable smoke detectors and Plaintiffs' alleged reliance on that assurance to their detriment. The Third Circuit has repeatedly made clear, however, that mere assurances or promises to help, even in the face of known dangers, are insufficient to sustain a state-created danger claim. *See, e.g.*, *Mears*,

24 F.4th at 884 ("[A]ssurances and failure to warn are not affirmative acts."); *Ye*, 484 F.3d at 640 ("We hold that a mere assurance cannot form the basis of a state-created danger claim."); *Bright*, 443 F.3d at 284 (3d Cir. 2006) (holding under *DeShaney* that "no 'affirmative duty to protect arises . . . from the State's . . . expressions of intent to help' an individual at risk"); *see also DeShaney*, 489 U.S. at 200 ("The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf."). Here, there are no allegations of affirmative conduct by the City Defendants that caused Plaintiffs' harm. Rather, Plaintiffs have alleged only that Defendant Fulton failed to follow through on her "promise" to replace the inoperable smoke detectors. These allegations are the quintessential allegations of omission, *i.e.*, a failure to act. Under the existing law of this Circuit, such "omissions are insufficient to trigger substantive due process liability." *Kaucher*, 455 F.3d at 435.[4] Absent allegations of actionable affirmative conduct by Defendant Fulton, Plaintiffs have not asserted viable claims under the state-created danger exception.

Nonetheless, to overcome this well-settled law, Plaintiffs rely on the Third Circuit's decisions in *Mears v. Connolly* and *L.R. v. School District of Philadelphia* to argue that they have met the affirmative conduct requirement by alleging that Defendant Fulton "affirmatively" undertook the obligation to replace the inoperable smoke detectors. (*See* Pls. Opp., ECF 11-1, at pp. 13, 15). Plaintiffs' argument and reliance on these cases is misplaced.

---

[4] As noted by the Third Circuit in *Bright*, it has "never found a state-created danger claim to be meritorious without an allegation and subsequent showing that state authority was *affirmatively exercised.*" 443 F.3d at 282 (emphasis added). Further, "state actors cannot 'use their authority' to create such an opportunity by failing to act." *Id.* at n.6; *see also Kaucher,* 455 F.3d at 433, n.11 (collecting cases in which Third Circuit held that defendant's "failures to act cannot form the basis of a valid § 1983 claim").

11

In *Mears*, the plaintiff was assaulted by her son while visiting him at a state-run psychiatric hospital. 24 F.4th at 882. Before that visit, the plaintiff was assured by a state psychiatrist that it was safe to visit the son, even though the son had severely beat another patient just days before the psychiatrist made that assurance. *Id.* at 882-883. During the visit, the plaintiff was initially accompanied by a nurse, but the nurse left the visitation room mid-visit, at which time the son attacked the plaintiff and beat her severely. *Id.* at 883. The plaintiff sued both the psychiatrist and the nurse under a state-created danger theory. *Id.* at 883. The district court dismissed both claims. *Id.* On appeal, the Third Circuit affirmed the dismissal of the claim against the psychiatrist, holding that his mere assurance that the plaintiff could safely visit the son was not an affirmative act similar to incarceration or institutionalization, as it "did not rob [the plaintiff] of her power to choose whether to visit. She was free to say no." *Id.* at 884. As to the nurse, however, the Third Circuit concluded that such an act had been sufficiently alleged because the nurse "exited the room, withdrawing her supervision mid-visit" and the plaintiff "could not leave [the visitation room] on her own." *Id.* at 885. Rather, the plaintiff's "movements within the facility were controlled by [the hospital's] personnel and she was not permitted to go outside the visiting room." *Id.* This alleged action, unlike the mere assurances of the psychiatrist, "robbed [the plaintiff] of the chance to decide whether to have an unsupervised visit or take extra precautions. And that is a plausible deprivation of liberty." *Id.*

Plaintiffs here contend that Defendant Fulton's actions are akin to those of the nurse in *Mears* because "[l]ike the nurse in *Mears*, Ms. Fulton gave support and then took away that support, leaving the victims exposed to harm." (Pls.' Opp., ECF 11-1, at p. 15). In making this argument, however, Plaintiffs overlook the key distinction drawn by the Third Circuit in *Mears* between the claims against the psychiatrist and the claims against the nurse: the nurse, unlike the

psychiatrist, restricted the plaintiff's freedom to act. *Mears*, 24 F.4th at 885. Unlike the nurse in *Mears* — who left the plaintiff alone in a visitation room that she could not leave on her own without the assistance of the nurse or other hospital personnel — here, Defendant Fulton did not restrict the apartment's residents (Plaintiffs) from acting in any way, including by replacing their own smoke detectors. In other words, Defendant Fulton's conduct did not "amount to a 'restraint of personal liberty' that is 'similar' to incarceration or institutionalization." *Id.* at 886 (quoting *Ye*, 484 F.3d at 640-41).

Contrary to Plaintiffs' argument, this Court opines that Defendant's promise/assurance that she would return and replace the apartment's smoke detectors is akin, not to the nurse in *Mears*, but to the psychiatrist in *Mears* — who assured the plaintiff that she could safely visit her son at the hospital. Like the psychiatrist's assurance, to which the plaintiff in *Mears* remained free to "say no," 24 F.4th at 884, Defendant Fulton's promise to replace the inoperable smoke detectors in no way restricted Plaintiffs' liberty to take precautions to protect themselves. As such, the Third Circuit's decision in *Mears* undercuts, rather than supports, Plaintiffs' state-created danger claims.

Plaintiffs' reliance on the Third Circuit's decision in *L.R.* is equally misplaced. In *L.R.*, a kindergartener was sexually assaulted by an adult to whom an elementary school teacher released the kindergartener without verifying that adult's identity. *Id.* at 239. In holding the release of the child to be an affirmative act for purposes of a state-created danger claim, the Third Circuit explained:

> The setting here is a typical kindergarten classroom. Children in this setting are closely supervised by their teacher. ***Their freedom of movement is restricted***. Indeed, they are not likely to use the bathroom without permission, much less wander unattended from the classroom. In the classroom, the teacher acts as the gatekeeper for very young children who are unable to make reasoned decisions about when and with whom to leave the classroom. Viewed in this

> light, [the child] was safe in her classroom unless and until her teacher . . . permitted her to leave.

*Id.* at 243 (emphasis added). Here, unlike the child in *L.R.*, the Plaintiffs' "freedom of movement" was not restricted in any way by Defendant Fulton's conduct. Rather, Plaintiffs were always free to leave the apartment and/or replace the smoke detectors. As such, the Third Circuit's decision in *L.R.* provides Plaintiffs no support.

Indeed, the Third Circuit's focus on the *status quo* in *L.R.* belies Plaintiffs' argument here. Recognizing the "inherent difficulty in drawing a line between an affirmative act and a failure to act," the *L.R.* Court adopted the following approach for evaluating the affirmative conduct element:

> Rather than approach this inquiry as a choice between an act and an omission, we find it useful to first evaluate the setting or the "status quo" of the environment before the alleged act or omission occurred, and then to ask whether the state actor's exercise of authority resulted in a departure from that status quo. This approach, which is not a new rule or concept but rather a way to think about how to determine whether this element has been satisfied, helps to clarify whether the state actor's conduct "created a danger" or "rendered the citizen more vulnerable to danger than had the state not acted at all."

*Id.* at 243 (citations omitted). If the contested action was only "a maintenance of the status quo," the action is insufficient to create liability. *Id.* at 243-44.

Here, the status quo of the apartment and/or the inoperable smoke detectors did not change as a result of Defendant Fulton's conduct. At the time of Defendant Fulton's inspection of the apartment and her promise to replace the inoperable smoke detectors, the smoke detectors were inoperable. The smoke detectors remained inoperable after her inspection and promise to replace the smoke detectors. Because Defendant Fulton's alleged conduct merely maintained the status quo, the conduct is insufficient under *L.R.* to create liability. *Id.*

In sum, Plaintiff's attempt to frame Defendant Fulton's alleged conduct as an affirmative act by merely placing the word "affirmatively" before what clearly amounts to an assurance, omission, and/or failure to act does "not alter the passive nature of the alleged conduct." *Morrow*, 719 F.3d at 179. Under the well-settled case law, such "omissions are insufficient to trigger substantive due process liability." *Kaucher*, 455 F.3d at 435. Absent allegations of actionable affirmative conduct by Defendant Fulton, Plaintiff has not asserted viable claims under the state-created danger exception. Accordingly, the City Defendant's motion to dismiss Count IV is granted.

### *Plaintiffs' Monell Claim Against the City (Count III)*

At Count III of the amended complaint, Plaintiffs assert a *Monell* claim against the City premised on, *inter alia*, the City's alleged failure to promulgate adequate policies and procedures for ensuring the safety of children in homes under the auspices of DHS and the City's failure to train its employees with respect to the same. In response, the City argues ***solely*** that this claim fails because Plaintiffs' state-created danger claim fails and relies on the Third Circuit's decisions in *Johnson v. City of Phila.*, 975 F.3d 394 (3d Cir. 2020) and *Brown v. Commonwealth of Pa., Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473 (3d Cir. 2003). (S*ee* Defs. Mtn., ECF 8, at pp. 16-17). The City's argument and reliance on these cases, however, is misplaced.

In *Johnson*, the Third Circuit expressly acknowledged that "a municipality may be 'independently liable for a substantive due process violation' even if no municipal employee is liable." 975 F.3d at 403 n.13 (citations omitted). As such, the City's bare argument that Plaintiffs'

15

*Monell* claim fails simply because Plaintiffs' state-created danger claim fails, without more, lacks merit.[5]  Accordingly, the City's motion to dismiss Count III is denied.

**CONCLUSION**

For the reasons set forth, the City Defendants' motion to dismiss is granted with respect to Plaintiffs' state-created danger claims asserted at Count IV and denied with respect to Plaintiffs' *Monell* claims asserted at Count III.  An Order consistent with this Memorandum Opinion follows.

*NITZA I. QUIÑONES ALEJANDRO*, J.

---

[5]  Notably, though Plaintiffs raise this legal deficiency in the City's argument, the City does not address it in its reply.