---

**HOWARD ROBINSON**, Individually and as
Administrator of the **ESTATE of TIFFANY
ROBINSON**, Deceased
c/o STROKOVSKY LLC
1650 Market Street
Suite 3600
Philadelphia, PA 19103;

and

**HOWARD ROBINSON**, Individually and as
Administrator of the **ESTATE of TANIESHA
ROBINSON**, Deceased
c/o STROKOVSKY LLC
1650 Market Street
Suite 3600
Philadelphia, PA 19103;

and

**HOWARD ROBINSON**, Individually and as
Administrator of the **ESTATE of DEKWAN
ROBINSON**, Deceased
c/o STROKOVSKY LLC
1650 Market Street
Suite 3600
Philadelphia, PA 19103;

and

**HOWARD ROBINSON**, Individually and as
Administrator of the **ESTATE of J'KWAN
ROBINSON**, Deceased
c/o STROKOVSKY LLC
1650 Market Street
Suite 3600
Philadelphia, PA 19103;

*Plaintiffs,*
v.

**CIVIL ACTION: 2:24-CV-00055**

**JURY TRIAL DEMANDED**

---

**PHILADELPHIA HOUSING AUTHORITY**
2013 Ridge Avenue
Philadelphia, PA 19121;

and

**KELVIN A. JEREMIAH**, individually and in
his official capacity
*c/o PHILADELPHIA HOUSING AUTHORITY*
2013 Ridge Avenue
Philadelphia, PA 19121;

and

**JANEA JORDON**, individually and in her
official capacity
*c/o PHILADELPHIA HOUSING AUTHORITY*
2013 Ridge Avenue
Philadelphia, PA 19121;

and

**DINESH INDALA**, individually and in her
official capacity
*c/o PHILADELPHIA HOUSING AUTHORITY*
2013 Ridge Avenue
Philadelphia, PA 19121;

and

**EARL SAMUEL**, in his individual capacity
*c/o PHILADELPHIA HOUSING AUTHORITY*
2013 Ridge Avenue
Philadelphia, PA 19121;

and

**RONALD HENRY**, in his individual capacity
*c/o PHILADELPHIA HOUSING AUTHORITY*
2013 Ridge Avenue
Philadelphia, PA 19121;

and

**MARY MOC**, in her individual capacity
*c/o PHILADELPHIA HOUSING AUTHORITY*
2013 Ridge Avenue
Philadelphia, PA 19121;

and

**ERICKA CORLEY**, in her individual capacity
*c/o PHILADELPHIA HOUSING AUTHORITY*
2013 Ridge Avenue
Philadelphia, PA 19121;

and

**TABATHA REVELL**, in her individual
capacity
*c/o PHILADELPHIA HOUSING AUTHORITY*
2013 Ridge Avenue
Philadelphia, PA 19121;

and

**TRUC NGUYEN**, in her individual capacity
*c/o PHILADELPHIA HOUSING AUTHORITY*
2013 Ridge Avenue
Philadelphia, PA 19121;

and

**BRAHIN BILAL**, in his individual capacity
*c/o PHILADELPHIA HOUSING AUTHORITY*
2013 Ridge Avenue
Philadelphia, PA 19121;

and

**CITY OF PHILADELPHIA**
1515 Arch Street
Philadelphia, PA 19102;

and

**NADINE FULTON**, in her individual capacity
*c/o CITY OF PHILADELPHIA*
1515 Arch Street
Philadelphia, PA 19102

                              *Defendants.*

## SECOND AMENDED COMPLAINT

This action arises out of a deadly fire that occurred in Unit B of Defendant Philadelphia Housing Authority ("PHA")'s property at 869 N. 23rd Street, Philadelphia, Pennsylvania 19130 (hereinafter, the "Property").

At the time of the fire, Unit B was dangerously overcrowded, with a family of 14 assigned by Defendant PHA to the cramped four-bedroom apartment. Unit B also lacked working smoke detectors. The detectors that had previously been installed by Defendant PHA were prohibited by the City of Philadelphia Fire Code. In the weeks leading up to the fire, these noncompliant detectors became inoperable. They were removed but never replaced by Defendant PHA. After the detectors were removed, PHA maintenance workers Defendants Samuel and Henry falsified maintenance forms stating untruthfully that Unit B's detectors were operable. This foreclosed the operation of a PHA emergency maintenance policy requiring replacement of smoke detectors within 24 hours of becoming inoperable or being removed.

The fire broke out in the early morning of January 5, 2022, while most of Unit B's residents were still asleep. The source of the fire was the family's Christmas tree. A five-year-old resident of Unit B with developmental disabilities, who is not a party in this action, is believed to have accidentally set fire to the tree while attempting to kill one of the many cockroaches that infested the dilapidated apartment. With no alarms to alert the sleeping residents, the fire spread and blocked Unit B's only exit, trapping the family in their burning home. The fire claimed the lives

of 12 residents of Unit B, including Plaintiff's Decedents.

1.      Plaintiff instituted this action pursuant to the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983 against Defendants for the relief requested below.

## PARTIES

2.      Plaintiff, Howard Robinson,[1] Individually and as Administrator of the Estate of Tiffany Robinson, Deceased, by and through his attorneys, Strokovsky LLC, files this Second Amended Complaint against Defendants Philadelphia Housing Authority (hereinafter "PHA") and City of Philadelphia and the individual and/or supervisory Defendants of PHA and City of Philadelphia as detailed below.

3.      Plaintiff, Howard Robinson, Individually and as Administrator of the Estate of Taniesha Robinson, Deceased, by and through his attorneys, Strokovsky LLC, files this Second Amended Complaint against Defendants PHA and City of Philadelphia and the individual and/or supervisory Defendants of PHA and City of Philadelphia as detailed below.

4.      Plaintiff, Howard Robinson, Individually and as Administrator of the Estate of DeKwan Robinson, Deceased, by and through his attorneys, Strokovsky LLC, files this Second Amended Complaint against Defendants PHA and City of Philadelphia and the individual and/or supervisory Defendants of PHA and City of Philadelphia as detailed below.

5.      Plaintiff, Howard Robinson, Individually and as Administrator of the Estate of J'Kwan Robinson, Deceased, by and through his attorneys, Strokovsky LLC, files this Second Amended Complaint against Defendants PHA and City of Philadelphia and the individual and/or supervisory Defendants of PHA and City of Philadelphia as detailed below.

---

[1] Plaintiff, Howard Robinson is the only surviving beneficiary of his children, set forth herein, and the only individual permitted to recover on their behalf.

6. Defendant PHA is a housing authority created as an agency and instrumentality of the Commonwealth of Pennsylvania with a principal place of business located 2013 Ridge Avenue, Philadelphia, Pennsylvania 19121.

7. At all material times relevant hereto, Defendant PHA acted by and through its duly authorized employees, agents, workers, and/or representatives, who were all acting within the scope of their agency.

8. At all material times relevant hereto, Defendant PHA directly and through its duly authorized employees, agents, workers, and/or representatives, owned, operated, managed, inspected, maintained, and/or actively controlled the premises located at 869 North 23rd Street, Unit B, Philadelphia, Pennsylvania 19130 (hereinafter "Unit B").

9. Defendant Kelvin Jeremiah (hereinafter "Defendant Jeremiah") is an adult individual and citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

10. Defendant Jeremiah was, at times material hereto, the President and Chief Executive Officer (hereinafter "CEO") of Defendant PHA. Defendant Jeremiah was appointed to this position on or about March 14, 2023. He was responsible for management of the PHA organization. Additionally, Defendant Jeremiah was the final policymaker for PHA and all aspects of PHA operations, including inspections, safety, maintenance, standards, procedures, protocols, and oversight. Defendant Jeremiah is being sued in both his individual and official capacities.

11. Defendant Janae Jordon (hereinafter "Defendant Jordon") is an adult individual and citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

12. Defendant Jordon was, at times material hereto, the Senior Executive Vice

President, Public Safety, Audit and Compliance of Defendant PHA. Defendant Jordon is a policymaker for PHA and was instructed with the task of identifying and reducing risks and ensuring that policies, procedures, laws, and regulations are followed throughout PHA. She was responsible for directing and overseeing PHA's internal audits, investigations, and compliance-related activities. Defendant Jordon is being sued in both her individual and official capacities.

13. Defendant Dinesh Indala (hereinafter "Defendant Indala") is an adult individual and citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

14. Defendant Indala was at times material hereto, the Senior Executive Vice President of Housing Operations of Defendant PHA. He was responsible for overseeing all property management and maintenance activities for PHA's public housing portfolio. He also oversees and supervises employees having responsibility for emergency and routine service orders, admissions and leasing, rent collections, recertifications, resident supportive services, and other functions. Defendant Indala is being sued in both his individual and official capacities.

15. Defendant Earl Samuel (hereinafter "Defendant Samuel") is an adult individual and citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

16. Defendant Samuel was, at times material hereto, a maintenance aid of Defendant PHA and Defendant PHA's scattered site program. He was responsible for ensuring that Plaintiff's Decedents' Unit B was safe, decent, and in a sanitary condition. In this function, Defendant Samuel was tasked with performing quality checks of PHA properties, including Plaintiff's Decedents' Unit B. Defendant Samuel is being sued in his individual capacity.

17. Defendant Ronald Henry (hereinafter "Defendant Henry") is an adult individual

and citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

18.　　Defendant Henry was, at times material hereto, a maintenance mechanic of Defendant PHA and Defendant PHA's scattered site program. He was responsible for ensuring that Plaintiff and Plaintiff's Decedents' Unit B was safe, decent, and in a sanitary condition. In this function, Defendant Henry was tasked with performing quality checks of PHA properties, including Plaintiff's Decedents' Unit B. Defendant Henry is being sued in his individual capacity.

19.　　Defendant Mary Moc (hereinafter "Defendant Moc") is an adult individual and citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

20.　　Defendant Moc was, at times material hereto, a property manager of Defendant PHA and Defendant PHA's scattered site program. She was responsible for ensuring that Plaintiff's Decedents' Unit B was safe, decent, and in a sanitary condition. Defendant Moc was tasked with managing all aspects of Unit B, including approving additional tenants and household members to be added to the lease of the property.  Defendant Moc is being sued in her individual capacity.

21.　　Defendant Ericka Corley (hereinafter "Defendant Corley") is an adult individual and citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

22.　　Defendant Ericka Corley was, at times material hereto, a property manager of Defendant PHA and Defendant PHA's scattered site program. She was responsible for ensuring that Plaintiff's Decedents' Unit B was safe, decent, and in a sanitary condition. Defendant Corley was tasked with managing all aspects of Unit B, including approving additional tenants and

household members to be added to the lease of the property. Defendant Corley is being sued in her individual capacity.

23.     Defendant Tabitha Revell (hereinafter "Defendant Revell") is an adult individual and citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

24.     Defendant Revell was, at times material hereto, a property manager of Defendant PHA and Defendant PHA's scattered site program. She was responsible for ensuring that Plaintiff's Decedents' Unit B was safe, decent, and in a sanitary condition. Defendant Revell was tasked with managing all aspects of Unit B, including approving additional tenants and household members to be added to the lease to the property.  Defendant Revell is being sued in her individual capacity.

25.     Defendant Truc Nguyen (hereinafter "Defendant Nguyen") is an adult individual and citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

26.     Defendant Nguyen was, at times material hereto, a property manager of Defendant PHA and Defendant PHA's scattered site program. She was responsible for ensuring that Plaintiff's Decedents' Unit B was safe, decent, and in a sanitary condition. Defendant Nguyen was tasked with managing all aspects of Unit B, including approving additional tenants and household members to be added to the lease to the property.  Defendant Nguyen is being sued in her individual capacity.

27.     Defendant Brahin Bilal (hereinafter "Defendant Bilal") is an adult individual and citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

28.     Defendant Bilal was, at times material hereto, a property manager of Defendant PHA and Defendant PHA's scattered site program. He was responsible for ensuring that Plaintiff's Decedents' Unit B was safe, decent, and in a sanitary condition. Defendant Bilal was tasked with managing all aspects of Unit B, including approving additional tenants and household members to be added to the lease to the property.  Defendant Bilal is being sued in his individual capacity.

29.     Defendants PHA, Jeremiah, Jordon, Indala, Samuel, Henry, Moc, Corley, Revell, Nguyen, and Bilal are hereinafter, collectively, referred to as the "PHA Defendants."

30.     Defendant, City of Philadelphia is a city, political subdivision, governmental or other jural entity, and municipality organized and existing under and by virtue of the laws of Commonwealth of Pennsylvania, with a principal place of business located at 1515 Arch Street, Philadelphia, Pennsylvania, 19102. The Philadelphia Department of Human Services (hereinafter "DHS") is a government agency of the City of Philadelphia of Philadelphia that exists, in part, to provide child welfare and juvenile justice services with a goal to provide and promote safety, permanency, and well-being for children.

31.     At all material times relevant hereto, Defendant City of Philadelphia, directly and through its duly authorized employees, agents, workers, and/or representatives of DHS inspected Unit B, for safety, including but limited to, the function and operability of its smoke detectors.

32.     At all material times relevant hereto, Defendant City of Philadelphia acted by and through its duly authorized employees, agents, workers, and/or representatives acting within the scope of their employment.

33.     Defendant Nadine Fulton (hereinafter "Defendant Fulton") is an adult individual and citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

34.     Defendant Fulton was, at all times material hereto, a social worker for Defendant City of Philadelphia, Department of Human Services. She was responsible for ensuring that families with children under DHS care, supervision, or investigation, are in a safe home. Defendant Fulton is being sued in her individual capacity.

35.     Defendants City of Philadelphia and Fulton are hereinafter, collectively, referred to as the "City Defendants."

## JURISDICTION AND VENUE

36.     This Second Amended Complaint alleges that Defendants violated Plaintiff and Plaintiff's Decedents' rights under the Fourteenth Amendment to the United States Constitution, remediable via 42 U.S.C. § 1983. Therefore, this Court exercises jurisdiction under 28 U.S.C. § 1331.

37.     The events giving rise to this litigation occurred in Philadelphia County and within the Eastern District of Pennsylvania. Therefore, venue is proper in this Court under 28 U.S.C. § 1391.

## OPERATIVE FACTS
### Public Housing Program Admissions and Continued Occupancy Policy

38.     The Pennsylvania Housing Authority Law provides that "The public purposes for which such authorities shall operate shall be . . . the providing of safe and sanitary dwelling accommodations for persons of low income through new construction or the reconstruction, restoration, reconditioning, remodeling or repair of existing structures…." *See* 35 P.S. § 1542(d).

39.     Under the public housing program, Defendant PHA rents apartments and houses it owns to low and very-low-income families and individuals. Public housing comes in all sizes and types, from scattered single-family houses to high rise apartments for elderly families.

40. PHA serves many of the lowest-income citizens of Philadelphia: Average household income is $14,213.00 among public housing households and $11,622.00 among Housing Choice Voucher (hereinafter "HCV")–assisted households.

41. The majority of PHA households are headed by seniors (35%) and/or people with disabilities (48%). PHA developments also house over 15,500 children under the age of 18.

42. A Housing Authority, such as Defendant PHA, is responsible for the management and operation of the local public housing program.

43. Defendant PHA administers its housing program often with the financial assistance of the United States Department of Housing and Urban Development (hereinafter "HUD"). In this capacity, HUD enters an Annual Contributions Contract (hereinafter "ACC") with the participating housing authority—here, Defendant PHA. 24 C.F.R. § 982.151. The ACC requires that the participating housing authority comply with HUD's federal guidelines in operating the housing program and that the contracting housing authority adopt an Admission and Continued Occupancy Policy (hereinafter "ACOP") for the administration of the program. *See* 42 U.S.C. § 1437c-1(d)(3)-(6), (12)-(15); 24 C.F.R. § 903.7(b), (c)-(f), (l)-(n).

44. As an oversight tool, HUD conducts regular Real Estate Assessment Center (hereinafter "REAC") inspections of certain housing units every one to three years to ensure that public housing units are decent, safe, and sanitary pursuant to HUD set standards.

45. Pursuant to Defendant PHA's ACOP, "[i]noperable smoke detectors" are considered an "emergency condition" within a dwelling unit.

46. HUD, PHA, and Pennsylvania state laws regarding habitability all require that emergency conditions such as inoperable smoke detectors be corrected within twenty-four (24) hours.

47.     If Defendant PHA cannot correct the emergency condition within the required twenty-four (24) hours, Defendant PHA must offer the occupants standard alternative accommodations.

48.     In addition to policies regarding the immediate correction of emergency conditions, PHA and HUD set policies regarding the number of residents that may occupy any given unit.

49.     Overcrowding can result in dangerous conditions. Therefore, a central purpose of these occupancy policies is to protect the occupants from the dangers associated with overcrowding.

50.     Defendant PHA is required to place families in a unit appropriate for the household's size and needs in accordance with applicable occupancy policies (24 C.F.R. § 966.4(c)(3)). In addition to safety concerns, these occupancy standards ensure that tenants are treated fairly and consistently and receive adequate housing space. One example, as provided by HUD of an occupancy standard, is a limit of no more than two persons per bedroom.

51.     Defendant PHA was required to comply with HUD's occupancy standards with respect to all of its housing and to ensure that a family is not "under-housed" — that is, that too many people will be living in a space than the space can safely accommodate. Section 7.2 of the 2021 ACOP states:

## 7.2    Minimum and Maximum Persons in a Unit

This table below provides general occupancy standard guidelines. This table must be used in conjunction with the narrative policies included in the Occupancy Guidelines portion of the ACOP.  For example a 4 person family consisting of a head of household, her 5 year old daughter, her six year old son and 3 year old son would not necessarily be provided with a 4 BR unit or a 2 BR unit as referenced in the table below. When you factor in the policies on Determining Unit Size this household would be eligible for a 3 BR unit – one for the head of household, one for the daughter and one for the two sons.

| Number of Bedrooms | Min. Persons/Unit | Max. Persons/Unit |
|---|---|---|
| 0 BR | 1 | 1 |
| 1 BR | 1 | 2 |
| 2 BR | 2 | 4 |
| 3 BR | 3 | 6 |
| 4 BR | 4 | 8 |
| 5 BR | 5 | 10 |
| 6 BR | 6 | 12 |

PHA will follow HUD's maximum HQS space standards in determining exceptions to the <u>maximum</u> allowable persons in a unit.

52.    A family is "under-housed" when the total number of occupants on the lease (or any annual recertification) exceed the available number of bedrooms in the unit in accordance PHA's Occupancy Standards Table.

53.    Per PHA's occupancy standards, a four-bedroom unit may have no more than eight (8) occupants.

### Occupancy Standards Table

| Number of Bedrooms | Min. Persons/Unit | Max. Persons/Unit |
|---|---|---|
| 0 BR | 1 | 1 |
| 1 BR | 1 | 2 |
| 2 BR | 2 | 4 |
| 3 BR | 3 | 6 |
| 4 BR | 4 | 8 |
| 5 BR | 5 | 10 |
| 6 BR | 6 | 12 |

54.    While the ACOP permits PHA to make exceptions to the occupancy guidelines, the ACOP states "PHA will follow HUD's maximum HQS space standards in determining exceptions to the <u>maximum</u> allowable persons in a unit." Thus, PHA's ACOP incorporates by reference

HUD's Housing Quality Standards ("HQS"), set forth in HUD's Housing Choice Voucher Program Guidebook, and applies these standards to all PHA units.

55.     HUD's HQS, Section 10.3 ("Performance Requirements and Acceptability Standards") states, under the heading "Space and Security:"

**Space and Security**

*Performance Requirement*

- The dwelling unit must provide adequate space and security for the family.

*Acceptability Criteria*

- At a minimum, the dwelling unit must have a living room, a kitchen and a bathroom.

- The dwelling unit must have a least one bedroom or living/sleeping room for every two persons. Other than very young children, children of opposite sex, may not be required to occupy the same bedroom or living/sleeping room.

56.     Thus, pursuant to PHA's ACOP and HUD's HQS space standards, the maximum occupancy exception that PHA could grant for a four-bedroom apartment with one living room, was 10 residents. This would represent an exception for two additional residents sleeping in the living room.

57.     Defendant PHA's 2021 ACOP Section 7.3 details the determination of unit size for a family (relevant portions set forth below):

**7.3     Determining Family Unit Size**

The following principles govern the size of the unit for which a family will qualify. PHA will assign the appropriate bedroom size based on PHA Occupancy Guidelines when necessary to avoid problems that arise when applicant choices indicated on pre-applications and updates are not in keeping with the guidelines.

PHA will apply occupancy standards consistent with the stated gender provided by the tenant. PHA may make exceptions to this occupancy standard policy where cases of gender identity and other household members are concerned. Exceptions will be made on a case by case basis.

Units will be assigned so that:

- Two (2) persons per bedroom will be the standard for the unit a family may be offered;

- Two children of the opposite sex will not be required to share a bedroom; however, they may share a bedroom at the family's request;

- <u>Two children of the same sex</u> share a bedroom regardless of age;

- <u>An adult and a child of the same sex</u> who are not more than 10 years apart in age will be required to share a bedroom. For example a 25 year old female adult would have to share a bedroom with a 16 year old female child.

- Two adults of the same sex, other than same sex couples in an inter-dependent relationship or domestic partnership, who are more than 10 years apart, are not required to share a bedroom; however, they may share a bedroom at the family's request.

- A husband and wife will be allocated one bedroom;

- A same or opposite sex couple that has an interdependent relationship or domestic partnership will be allocated one bedroom;

- An SRO will only be assigned to a one person household;

- A family that consists of a pregnant woman (with no other persons) will be treated as a two-person family; however the family will be offered a 1 BR unit.

58.     If occupants are under-housed, Defendant PHA's ACOP Section 15.3 regarding Mandatory Transfers requires Defendant PHA to initiate a mandatory transfer of the occupants. Thus, the ACOP provides that a violation of occupancy standards results in "mandatory" transfers to correct the occupancy violations.

59.     As set forth above, (1) if PHA becomes aware of inoperable smoke detectors, PHA is required to fix those smoke detectors within twenty-four (24) hours or move the occupants; and (2) if PHA has an underhoused family as determined by the number of occupants listed on the lease, PHA must correct the under-housing issue by transferring the occupants.

60.     At all times material hereto, Defendants were aware of the health risks and dangers associated with continued overcrowding, lack of operable smoke detectors, and lack of adequate egress in the event of a fire. Defendants were aware that continued overcrowding, lack of operable smoke detectors, and lack of adequate egress in homes can lead to serious bodily injury and/or death.

### Defendant PHA's "No-Transfer" Policy of Under-housing Multigenerational Families Despite Clear and Obvious Fire Safety Hazards

61.     n June of 2003, HUD released its Public Housing Occupancy Guide, which

explicitly warned housing authorities that "no transfer" policies that permit dangerous overcrowding violated the terms of the housing authorities' ACOPs:

**5.5    Making the Best Use of Available Units**

A very common failing in the area of Occupancy Standards occurs when PHAs permit long-time residents to remain in units that are significantly too large for their families even though there is demand for the size of unit in which the family is over housed. The only situations in which a family should occupy a unit with more bedrooms than family members would be:

- As a reasonable accommodation to a person with a disability (e.g., a resident with a disability has large and bulky apparatus related to the disability in the apartment and an extra bedroom is demand for only location where it can reasonably be stored); or
- Because there is currently no demand for the unit size the family occupies (although in this situation the family must understand that they would be required to transfer if a family with the number of persons requiring the unit size qualifies for housing;[16] or
- A resident has a Live-in-Aide who needs an extra bedroom.

A second problem in the area of Occupancy Standards is overcrowding. Transferring residents who have outgrown their homes is unpopular with many PHAs because it necessitates making two units ready, the one the family moved to and the one they are moved from. PHAs cannot, however, adopt a "no transfer" policy for overcrowded families because this results in unsafe and substandard conditions. The obligation of the PHA to operate decent, safe and sanitary housing comes directly from the Annual Contributions Contract with HUD.

62.    The rationale behind prohibiting overcrowding is made clear: it "results in unsafe and substandard conditions."

63.    Despite HUD's explicit prohibition of no-transfer policies, Defendant PHA adopted an official unwritten policy and/or widespread custom of keeping large, multigenerational families intact within overcrowded units, rather than initiate a "family transfer" of all residents into an appropriately sized unit or initiate a "split-family transfer," which reallocates one PHA family unit into two or more families placed in separate PHA properties.

64.    Upon information and belief, Defendant PHA adopted this no-transfer policy following the PHA's return to local control on April 26, 2013, under the leadership of Defendant Jeremiah. For the two years prior, Defendant PHA had been under federal receivership administered by HUD.

65.    Pursuant to this no-transfer policy, PHA employees authorized leases of

overcrowded units that would have been subject to mandatory family or split-family transfer to safe, appropriately sized units.

66. Pursuant to this no-transfer policy, PHA policymakers prohibited PHA employees from initiating split-family transfers required by the ACOP and PHA procedures to rehouse residents of overcrowded units, unless the family requested to be transferred to multiple units.

67. One effect of this no-transfer policy is to shift the burden to residents to make an affirmative request before Defendant PHA would comply with the ACOP's written guidelines and provide safe, appropriately sized housing through a split-family transfer.

68. At no time were the residents of Unit B made aware of this policy requiring affirmative action on their part to initiate a split-family transfer.

69. In a January 6, 2022 news conference following the fire at issue in this case, Defendant Jeremiah, CEO of Defendant PHA explained that the fourteen members of the family living in Unit B were not rehoused to multiple units, pursuant to this policy and/or widespread custom, because the family had not explicitly requested a transfer of that nature, saying:

> "At the time that the family moved into this unit, uh, in 2011, it was a family of six in a four bedroom unit. The family had children…and the family grew. And our policies and procedures, um, does not evict people because they have children. We don't remove them because their families are growing."[2]

70. When asked whether PHA had considered rehousing the family into separate appropriately sized units, Defendant Jeremiah indicated that, pursuant to the no-transfer policy, the family would have needed to make a request in order to be transferred, saying, "We have absolutely no indication that the family wanted to do that."

71. Defendant Jeremiah further explained the rationale behind PHA's policy and/or

---

[2] https://www.youtube.com/watch?v=9M5pegvhWLc at 5:00-7:00; 21:00-22:05.

widespread custom to not rehouse multigenerational families despite overcrowded conditions in their units:[3]

> Both city officials and Jeremiah have also said they did not act to split the family up for a variety of other reasons, including sensitivity toward preserving multigenerational households.
>
> "There is nothing in policy that precludes them from continuing to reside in that home as an intergenerational family. This is something that resonates frankly in many Black and brown communities and is certainly not unique to Philadelphia," Jeremiah said at a Tuesday news conference.

72.     On January 14, 2022, Defendant PHA, by and through an official spokesperson, Nichole Tillman, confirmed that PHA chose to not split the Unit B occupants into separate households to alleviate overcrowding pursuant to its no-transfer policy:[4]

> PHA said its decision not to do so was not motivated by any particular guideline but by officials' belief it was a better course of action.
>
> "The policy you reference provides PHA with the authority to involuntarily split families, but we do not unilaterally take that action," said PHA spokesperson Nichole Tillman. "We believe it would be counterproductive to forcibly split up an intact family that has not requested to move and wishes to remain together."

73.     Thus, under Defendant PHA's no-transfer policy, PHA "do[es] not unilaterally" take actions required by federal law, the ACOP, and PHA guidelines in order to ensure the safety of residents like those living in Unit B from hazards including fire.

74.     This policy and/or custom of prohibiting PHA employees from complying with federal law, the ACOP and PHA guidelines without an affirmative request from the resident does

---

[3] *Id.*
[4] https://www.inquirer.com/news/philadelphia-housing-authority-overcrowding-fairmount-fire-victims-20220114.html

not reflect an isolated incident unique to the residents of Unit B. Rather, it is a widespread custom and practice exhibited by PHA's approach to other such multigenerational families.

75.     According to public records, numerous intergenerational families in Defendant PHA's system have been kept in dangerously overcrowded units, pursuant to this policy and/or custom. The following leases of overcrowded units authorized by PHA with multigenerational families are illustrative of this practice:

**Figure 1a**



**LEASE AGREEMENT**

Tenant I.D.#          223621
Development *          PA002000908
No. Bedrooms          4

This LEASE AGREEMENT ("Lease") is dated this 1st day of April, 2012 by and between the Philadelphia Housing Authority ("PHA") or ("Management") and Zakia Alsbrooks ("Tenant"). PHA and Tenant hereby agree on the following terms and conditions:

1.     **PREMISES**

A.     Subject to the terms and conditions of this Lease and in consideration of the rent, Management leases to Tenant, Apartment number 690972, located at 3211 W Dauphin St ., for use as a private residence. The Apartment shall include any steps, porch, lawn or yard surrounding the apartment and shall be referred to herein as the "Dwelling Unit" or "Premises". PHA shall provide a stove on the Premises at no cost to the Tenant.

B.     The Premises are for the exclusive use and occupancy by Tenant and Household Members listed below:

| NAME | RELATIONSHIP | SOCIAL SECURITY NUMBER | BIRTHDATE | M/F | DELE TE/ ADD | DATE |
|------|-------------|------------------------|-----------|-----|------|------|
| 1. Zakia Alsbrooks | Head of Family | ███ | ███ | F | | 04-01-2012 |
| 2. Ayannah Griffin | Sister | ███ | ███ | F | | 04-01-2012 |
| 3. Juhziar Johnson | Son | ███ | ███ | M | | 04-01-2012 |
| 4. Neiman Johnson | Son | ███ | ███ | M | | 04-01-2012 |
| 5. Jaydah Alsbrooks-johnson | Daughter | ███ | ███ | F | | 04-01-2012 |
| 6. Ahmad Griffin-harris | Nephew | ███ | ███ | M | | 04-01-2012 |
| 7. | | | | | | |

(4.1.2012 – Six Individuals (Mother, Sister, Children, and Nephew) in a Four-Bedroom Unit)

## Figure 1b – Family Composition Change

**LEASE AGREEMENT**

| | |
|---|---|
| Tenant I.D.# | 223621 |
| Development * | PA002000908 |
| No. Bedrooms | 4 |

This LEASE AGREEMENT ("Lease") is dated this 1st day of August, 2016 by and between the Philadelphia Housing Authority ("PHA") and Zakia Alsbrooks ("Tenant"). PHA and Tenant hereby agree on the following terms and conditions:

**1. PROPERTY LEASED**

A. Subject to the terms and conditions of this Lease and in consideration of the Rent defined below, PHA leases to Tenant, unit number 690972, located at 3211 W Dauphin St , ("Unit"), for use as a private residence. The Unit shall include any steps, porch, lawn or yard surrounding the Unit and shall be referred to in this Lease as the "Property." If indicated by an [x], the Property includes a stove ___ at no cost to Tenant, a refrigerator_____ at no cost to Tenant, and a washer/dryer ___ at no cost to tenant.

B. The Property is for the exclusive use and occupancy by the Tenant, Family Members, and Household Members, listed below:

| NAME | RELATIONSHIP | SOCIAL SECURITY NUMBER | BIRTHDATE | M/F | DELE TE/ ADD | DATE |
|---|---|---|---|---|---|---|
| 1. Zakia Alsbrooks | Head of Family | | | F | | 08-01-2016 |
| 2. Ayannah Griffin | Sister | | | F | | 08-01-2016 |
| 3. Jahziar Johnson | Son | | | M | | 08-01-2016 |
| 4. Neiman Johnson | Son | | | M | | 08-01-2016 |
| 5. Brasil Griffin | Niece | | | F | | 08-01-2016 |
| 6. Jaydah Alsbrooks- Johnson | Daughter | | | F | | 08-01-2016 |
| 7. Ahmad Griffin- Harris | Nephew | | | M | | 08-01-2016 |
| 8. Legend Johnson | Son | | | M | | 08-01-2016 |
| 9. 05-24-2011 | Daughter | | | F | | 08-01-2016 |
| 10. | | | | | | |

(8.1.2016 – Nine Individuals (Mother, Sister, Children, Niece, and Nephew) in a Four-Bedroom Unit – Addition of Three Occupants from Prior Lease)

## Figure 2a

**LEASE AGREEMENT**

| | |
|---|---|
| Tenant I.D.# | 235177 |
| Development * | PA002000030 |
| No. Bedrooms | 3 |

This LEASE AGREEMENT ("Lease") is dated this 1st day of April, 2012 by and between the Philadelphia Housing ("PHA") or ("Management") and Bryen Sidney ("Tenant"). PHA and Tenant hereby agree on the following terms and conditions:

**1. PREMISES**

A. Subject to the terms and conditions of this Lease and in consideration of the rent, Management leases to Tenant, Apartment number 300260, located at 3220 Memichael St D, for use as a private residence. The Apartment shall include any steps, porch, lawn or yard surrounding the apartment and shall be referred to herein as the "Dwelling Unit" or "Premises." PHA shall provide a stove on the Premises at no cost to the Tenant.

B. The Premises are for the exclusive use and occupancy by Tenant and Household Members listed below:

| NAME | RELATIONSHIP | SOCIAL SECURITY NUMBER | BIRTHDATE | M/F | DELE TE/ ADD | DATE |
|---|---|---|---|---|---|---|
| 1. Bryen Sidney | Head of Family | | | M | | 04-01-2012 |
| 2. Tamir Sidney | Son | | | M | | 04-01-2012 |
| 3. Tybira Brown | Spouse/Co Head | | | F | | 04-01-2012 |
| 4. Tyshanae Brown | Other Relation | | | F | | 04-01-2012 |
| 5. Tykiem Whittaker | Other Relation | | | M | | 04-01-2012 |



(4.1.2012 – Five Individuals (Father, Spouse, Son, Other Relatives) in a Three-Bedroom Unit)

**Figure 2b – Family Composition Change**

**LEASE AGREEMENT**

| | |
|---|---|
| Tenant I.D.# | 235177 |
| Development * | PA002000030 |
| No. Bedrooms | 3 |

This LEASE AGREEMENT ("Lease") is dated this 1st day of August, 2016 by and between the Philadelphia Housing Authority ("PHA") and Bryen Sidney ("Tenant"). PHA and Tenant hereby agree on the following terms and conditions:

**1. PROPERTY LEASED**

A. Subject to the terms and conditions of this Lease and in consideration of the Rent defined below, PHA leases to Tenant, unit number 300260, located at 3220 Mcmichael St. D, ("Unit"), for use as a private residence. The Unit shall include any steps, porch, lawn or yard surrounding the Unit and shall be referred to in this Lease as the "Property." If indicated by an [x], the Property includes a stove _____ at no cost to Tenant, a refrigerator _____ at no cost to Tenant, and a washer/dryer _____ at no cost to tenant.

B. The Property is for the exclusive use and occupancy by the Tenant, Family Members, and Household Members, listed below:

| NAME | RELATIONSHIP | SOCIAL SECURITY NUMBER | BIRTHDATE | M/F | DELETE/ ADD | DATE |
|---|---|---|---|---|---|---|
| 1. Bryen Sidney | Head of Family | | | M | | 08-01-2016 |
| 2. Tamir Sidney | Son | | | M | | 08-01-2016 |
| 3. Tybira Sidney | Spouse | | | F | | 08-01-2016 |
| 4. Michaela Sidney | Daughter | | | F | | 08-01-2016 |
| 5. Bryen Sidney Jr. | Son | | | M | | 08-01-2016 |
| 6. Tyshanae Brown | Other Relation | | | F | | 08-01-2016 |
| 7. Tykiem Whittaker | Other Relation | | | M | | 08-01-2016 |
| 8. | | | | | | |

(8.1.2016 – Seven Individuals (Father, Spouse, Children, and Other Relatives) in a Three-Bedroom Unit – Addition of Two Occupants from Prior Lease)

**Figure 3a**



**LEASE AGREEMENT**

| | |
|---|---|
| Tenant I.D.# | 177868 |
| Development * | PA002000903 |
| No. Bedrooms | 3 |

This LEASE AGREEMENT ("Lease") is dated this 1st day of April, 2012 by and between the Philadelphia Housing Authority ("PHA") or ("Management") and Deardra Witcher ("Tenant"). PHA and Tenant hereby agree on the following terms and conditions:

**1. PREMISES**

A. Subject to the terms and conditions of this Lease and in consideration of the rent, Management leases to Tenant, Apartment number 857423, located at 628 Mifflin St , for use as a private residence. The Apartment shall include any steps, porch, lawn or yard surrounding the apartment and shall be referred to herein as the "Dwelling Unit" or "Premises". PHA shall provide a stove on the Premises at no cost to the Tenant.

B. The Premises are for the exclusive use and occupancy by Tenant and Household Members listed below:

| NAME | RELATIONSHIP | SOCIAL SECURITY NUMBER | BIRTHDATE | M/F | DELETE/ ADD | DATE |
|---|---|---|---|---|---|---|
| 1. Deardra Witcher | Head of Family | | | F | | 04-01-2012 |
| 2. Trevonne Woodfolk | Son | | | M | | 04-01-2012 |
| 3. Samira Witcher | Daughter | | | F | | 04-01-2012 |
| 4. Makiya Witcher | Daughter | | | F | | 04-01-2012 |
| 5. Gary Bartley | Son | | | M | | 04-01-2012 |
| 6. Nasir Bartley | Son | | | M | | 04-01-2012 |
| 7. | | | | | | |

(4.1.2012 – Six Individuals (Mother and Children) in a Three-Bedroom Unit)

## Figure 3b – Family Composition Change

### LEASE AGREEMENT

Tenant I.D.# 177868
Development * PA002000903
No. Bedrooms 3

This LEASE AGREEMENT ("Lease") is dated this 1st day of August, 2016 by and between the Philadelphia Housing Authority ("PHA") and Deardra Witcher ("Tenant"). PHA and Tenant hereby agree on the following terms and conditions:

**I. PROPERTY LEASED**

A. Subject to the terms and conditions of this Lease and in consideration of the Rent defined below, PHA leases to Tenant, unit number 857423, located at 628 Mifflin St . ("Unit"), for use as a private residence. The Unit shall include any steps, porch, lawn or yard surrounding the Unit and shall be referred to in this Lease as the "Property". If indicated by an [x], the Property includes a stove [ ] at no cost to Tenant, a refrigerator [ ] at no cost to Tenant, and a washer/dryer [ ] at no cost to tenant.

B. The Property is for the exclusive use and occupancy by the Tenant, Family Members, and Household Members, listed below:

| NAME | RELATIONSHIP | SOCIAL SECURITY NUMBER | BIRTHDATE | M/F | DELETE/ADD | DATE |
|------|--------------|------------------------|-----------|-----|------------|------|
| 1. Deardra Witcher | Head of Family | | | F | | 08-01-2016 |
| 2. Trevonne Woodfolk | Son | | | M | | 08-01-2016 |
| 3. Samira Witcher | Daughter | | | F | | 08-01-2016 |
| 4. Makiya Witcher | Daughter | | | F | | 08-01-2016 |
| 5. Gary Bartley Jr | Son | | | M | | 08-01-2016 |
| 6. Nasir Witcher-Bartley | Son | | | M | | 08-01-2016 |
| 7. Rashad Alexander | Son | | | M | | 08-01-2016 |
| 8. | | | | | | |

(8.1.2016 – Seven Individuals (Mother and Children) in a Three-Bedroom Unit – Addition of One Occupant from Prior Lease)

## Figure 4a

### LEASE AGREEMENT

Tenant I.D.# 162997
Development * PA002000010
No. Bedrooms 3

This LEASE AGREEMENT ("Lease") is dated this 1st day of April, 2012 by and between the Philadelphia Housing Authority ("PHA") or ("Management") and Kizzy Hudson ("Tenant"). PHA and Tenant hereby agree on the following terms and conditions:

**I. PREMISES**

A. Subject to the terms and conditions of this Lease and in consideration of the rent, Management leases to Tenant, Apartment number 101198, located at 2326 Diamond St ., for use as a private residence. The Apartment shall include any steps, porch, lawn or yard surrounding the apartment and shall be referred to herein as the "Dwelling Unit" or "Premises". PHA shall provide a stove on the Premises at no cost to the Tenant.

B. The Premises are for the exclusive use and occupancy by Tenant and Household Members listed below:

| NAME | RELATIONSHIP | SOCIAL SECURITY NUMBER | BIRTHDATE | M/F | DELETE/ADD | DATE |
|------|--------------|------------------------|-----------|-----|------------|------|
| 1. Kizzy Hudson | Head of Family | | | F | | 04-01-2012 |
| 2. Fatemia Harrington | Daughter | | | F | | 04-01-2012 |
| 3. Kienna Harrington | Daughter | | | F | | 04-01-2012 |
| 4. Shakirah Harrington | Daughter | | | F | | 04-01-2012 |
| 5. Shayona Harrington | Daughter | | | F | | 04-01-2012 |
| 6. Tymir Harrington | Son | | | M | | 04-01-2012 |
| 7. | | | | | | |

(4.1.2012 – Six Individuals (Mother and Children) in a Three-Bedroom Unit)

**Figure 4b – Family Composition Change**



**LEASE AGREEMENT**

Tenant I.D.# _____ 162997
Development * _____ PA002000010
No. Bedrooms _____ 3

This LEASE AGREEMENT ("Lease") is dated this 1st day of August, 2016 by and between the Philadelphia Housing Authority ("PHA") and Kizzy Hudson ("Tenant"). PHA and Tenant hereby agree on the following terms and conditions:

**I. PROPERTY LEASED**

A. Subject to the terms and conditions of this Lease and in consideration of the Rent defined below, PHA leases to Tenant, unit number 101198, located at 2326 Diamond St . , ("Unit"), for use as a private residence. The Unit shall include any steps, porch, lawn or yard surrounding the Unit and shall be referred to in this Lease as the "Property." If indicated by an [x], the Property includes a stove, ____ at no cost to Tenant, a refrigerator ____ at no cost to Tenant, and a washer/dryer ____ at no cost to tenant.

B. The Property is for the exclusive use and occupancy by the Tenant, Family Members, and Household Members, listed below:

| NAME | RELATIONSHIP | SOCIAL SECURITY NUMBER | BIRTHDATE | M/F | DELE TE/ ADD | DATE |
|------|-------------|------------------------|-----------|-----|------|------|
| 1. Kizzy Hudson | Head of Family | | | F | | 08-01-2016 |
| 2. Gregory Gayle | Son | | | M | | 08-01-2016 |
| 3. Fatemia Harrington | Daughter | | | F | | 08-01-2016 |
| 4. Kionna Harrington | Daughter | | | F | | 08-01-2016 |
| 5. Shakirah Harrington | Daughter | | | F | | 08-01-2016 |
| 6. Shayona Harrington | Daughter | | | F | | 08-01-2016 |
| 7. Tymir Harrington Gayle | Son | | | M | | 08-01-2016 |
| 8. | | | | | | |

(8.1.2016 – Seven Individuals (Mother and Children) in a Three-Bedroom Unit – Addition of One Occupant from Prior Lease)

76. This no-transfer policy and/or custom adopted and put into effect by Defendant PHA directly violates HUD Guidelines and the ACOP.

77. The no-transfer policy contradicts PHA's ACOP, which requires PHA to initiate transfers when a family's size exceeds occupancy guidelines and authorizes split family transfers as one means of doing so when a suitably sized single-family property is not available.

**15.8 Occupancy Standards**

PHA will transfer resident families when the family size has changed and the family is now too large (under-housed) or too small (over-housed) for their unit.

Occupancy Standards transfers will be initiated by PHA when applicable household changes dictate the need for an occupancy standard transfer. Occupancy Standards transfers are mandatory for the resident. Over/under-housed status will be determined at the time of recertification/interim recertification.

PHA may elect not to transfer an over-housed family in order to prevent vacancies.

A family that is required to move because of family size will be advised by PHA that a transfer is necessary and that the family has been placed on the appropriate transfer list.

If a family opts for a smaller unit size than would normally be assigned under PHAs occupancy standards, PHA may require the head of household's signature on a lease amendment acknowledging and agreeing with the approved guideline exception.

To alleviate an overcrowding situation, PHA may consider initiating a Split Family Transfer. Split Family Transfers will be initiated by PHA as a means of addressing an overcrowding situation. Families that split into two (2) "new" families may be required to transfer to two (2) different units. In the event that a Split

Family Transfer is identified by PHA as a means to address an overcrowding situation, the following conditions must be met:

- All members of the family must be listed on the most recent lease and recertification documentation;

- The family must be overcrowded;

- Both heads of household must be legally capable of executing PHA's dwelling lease;

- The original head of household and any members that will remain in that family must be eligible for Public Housing and must pass the transfer screening criteria; and

- The splitting family (new head of household and family members) must be eligible for Public Housing and must pass applicant screening criteria.

78.     Defendant PHA's no-transfer policy and/or custom, had the foreseeable result of subjecting Defendant PHA's tenants like Plaintiff's Decedents to dangerously overcrowded housing conditions.

79.     Pursuant to this no-transfer policy, PHA employees also authorized leases to "overhoused" families living in PHA properties, whereby families or individuals lived in PHA properties too large for their family size. The process of overhousing families is hereinafter referred to as "underutilized housing."

80.     This underutilized housing practice results in larger units being occupied and effectively unavailable to those families who are in need of larger units due to said families' household size.

81.     The below example leases of five and six–bedroom PHA properties obtained from public records illustrate how the no-transfer policy resulted in PHA leases of underutilized housing

that could have been used to alleviate dangerous overcrowding conditions like those that existed

in Unit B. Numerous other examples of similarly underutilized units with fewer than six bedrooms

are also available in public records.

**Figure 5**



(Six (6) Bedroom unit occupied by two individuals – August 2016)

**Figure 6**



(Six (6) Bedroom unit occupied by two individuals – August 2016)

**Figure 7**



(Five (5) Bedroom unit occupied by one individual – August 2016)

**Figure 8**



(Five (5) Bedroom unit occupied by one individual – August 2016)

**Figure 9**



(Five (5) Bedroom unit occupied by one individual – August 2016)

82.    Thus, PHA's no-transfer policy operated to perpetuate housing imbalances in PHA's system, with PHA employees authorizing leases of both underutilized properties and dangerously overcrowded properties.

83.    Even prior to the adoption of the no-transfer policy, the PHA Defendants were placed on actual notice of pervasive housing imbalances within PHA's system. In the Summer of 2013, HUD conducted a review directing PHA to address such "Occupancy Imbalances," which plagued PHA. In response to this HUD Review, PHA devised a Response titled, "Long Term Plan to Correct Occupancy Imbalances":

84.     This Long-Term Plan was summarized as follows:

**B. Project Summary:**

PHA has prepared a long term plan and strategy to address tenants that are over housed and to provide measurable outcomes that show the progress PHA is making in addressing this occupancy standard issue. PHA plans to execute the long term strategy for remedying the challenge of over housed tenants by prioritizing the most extreme cases within one (1) year. After which, additional project will begin to address the less severe situations. PHA notes that as families increase and decrease in family size on a daily basis, the numbers listed below will fluctuate. Additionally families leave the PH program on a daily basis which will also impact the numbers. These fluctuations must be taken into account at each stage of each project.

| Projects | Over housed Tenants | Number of tenants* | Projected Timeline |
|---|---|---|---|
| Project I | Four (4) or more bedrooms | 172 | Year 1 |
| Project II | Three (3) bedrooms | 278 | Years 2-3 |
| Project III | Two (2) bedrooms | 1345 | Year 4-7 |

*Data as of April 8, 2014

85.     Project I – referring to the 172 tenants identified above, were to be transferred by May 2015; however, as of September 10, 2015, only Phase I of the six (6) phases, *i.e.* identifying overhoused tenants was completed:

| Phases | Deliverables | Status Update and Proposed Timeline | Status Update as of 9/10/2015 |
|---|---|---|---|
| **Phase I** | | | |
| Identify the exact number of tenants currently on the over housed waitlist and establish the number of tenants to be transferred. | A complete list of current over housed tenants will be reviewed including demographics such as age, accommodation needs, current bedroom size, actual bedroom size needed, and other relevant information. | This phase is **complete**. As of April 8, 2014, a total list of 1,795 over housed tenants for Public Housing have been identified.<br><br>Out of one thousand seven hundred ninety-five (1795) over housed tenants, a total of one hundred seventy-two (172) tenants have been identified as extreme cases of occupancy imbalances who are over housed by four (4) or more bedrooms.<br><br>Timeline: March 1, 2014 – April 15, 2014. | Complete. |
| **Phase II** | | | |
| Identify unit availability to transfer one hundred seventy-two (172) over housed tenants, moving cost, and possible funding sources for rehabilitating one hundred seventy-two (172) units. | Current unit inventory will be reviewed to identify available units to transfer one hundred seventy-two (172) over housed tenants.<br><br>Total costs and funding sources will be established to rehabilitate one hundred seventy-two (172) units. | List of tenants over housed by four (4) or more bedrooms have been identified.<br><br>Timeline: April 15, 2014 - September 30, 2014. | |

86.     Yet, as the examples cited above illustrate, this Plan was not only unfulfilled but ignored through at least 2016, as PHA continued to authorize leases to individuals / families in underutilized units, pursuant to PHA's no-transfer policy; hence, causing the number of unit imbalances to increase.

87.     Upon information and belief, despite the goals laid out in this plan, PHA continued to authorize leases of both underutilized and dangerously overcrowded units pursuant to PHA's no-transfer policy through the time of the fire.

## Unit B Was One Of The Three Most Underhoused Units in Defendant PHA's System at or Around the Time of the Fire

88.     In the latest discovery produced by Defendant PHA, a PHA spreadsheet analyzed and categorized a total of 7,563 units owned and managed by Defendant PHA as either Underhoused or Overhoused.

89.     Of the 7,563 units in Defendant PHA's analysis, Unit B was one of the three most underhoused units in Philadelphia, when there were twelve (12) occupants in the unit, before it grew to fourteen (14) occupants in the unit.

90.     In other words, Unit B was one of three most overcrowded and improperly sized units to house a family composed of twelve individuals.

91.     The document below, which was produced during ongoing discovery, demonstrates the calculated bedroom size for the Unit B family should have been seven (7) bedrooms; yet the family was reauthorized for Unit B with only four (4) bedrooms.

| | Client ID | Unit | Site | Division | Calculated Bedroom Size | Actual Bedroom Size | Over/Under Housed |
|---|---|---|---|---|---|---|---|
| 1 | | | | | | | |
| 2 | 201733 | 125309 | 903 | SS | 8 | 5 | Underhoused |
| 3 | 841986 | 150377 | 015 | CS | 7 | 4 | Underhoused |
| 4 | 073360 | 691387 | 906 | SS | 7 | 4 | Underhoused |

92.     As early as on or about February 2015, the Unit B family requested a transfer with

Defendant PHA to a more appropriately sized unit.

93.    This request was reiterated in or about March 2015.

94.    More startling, within the same neighborhood of Francisville, multiple properties were identified comprised of six (6) bedrooms with only one or two persons residing in that six (6) bedroom property.

| Site | Unit ID | Address | Client ID | HOH Name | Actual BR Size | Family Size | Calculated BR Size | Over/Under Indicator | By Over/Under | Age of Head of Household | Ages in Household | 504 Accessible Type |
|------|---------|---------|-----------|----------|----------------|-------------|--------------------|----------------------|---------------|--------------------------|-------------------|---------------------|
| Francisville | 125801 | 826 N 20TH STREET, Philadelphia, PA | 090718 | Stephen Mcdaniels | 6 | 1 | 1 | OverHoused | 5 | S | | M2 |
| Francisville | 691287 | 812 N 20TH STREET, | 015535 | David Selby | 6 | 1 | 1 | OverHoused | 5 | S | | |
| Francisville | 042150 | 1704 N GRATZ ST, Philadelphia, | 213559 | Deborah Brockington | 6 | 1 | 1 | OverHoused | 5 | NS - 51 | | |

95.    Despite the availability of units which would be more suitable to house the family, Defendant PHA ignored such requests and continued to reauthorize the lease of Unit B.

96.    When PHA authorized a lease allowing the number of occupants in Unit B to increase to fourteen (14) individuals, Unit B exceeded the highest limit for a unit household size:



97.     Upon information and belief, in May of 2021, PHA's authorization of a lease increasing the occupancy of Unit B to fourteen (14) occupants rendered Unit B the most underhoused unit across all of PHA's portfolio.

## 869 N. 23rd STREET

98.     Defendant PHA acquired the property at 869 N. 23rd Street, Philadelphia, Pennsylvania 19130 on or around October 8, 1967, for $1.00. At the time, the Property was a single-family dwelling.

99.     While in possession of the Property, Defendant PHA converted the Property from a single-family dwelling to a two-unit apartment comprised of Unit A (first floor), and Unit B (second floor) (collectively, the "Building").

100.    The Building includes a basement and three floors. Unit A is located on the first and second floors and Unit B is located on the second and third floor. Defendant PHA installed a wall on the second floor separating the portions of the second floor that belong to Unit A from the portions that belong to Unit B.

101.    Unit B has four bedrooms, a kitchen, living room, and is approximately 1,600 square feet in size.

102.    Unit B's living room and kitchen are on the Building's second floor. Unit B's 4 bedrooms are all on the Building's third floor.

103.    During the Property's renovation and conversion, Defendant PHA relocated the stairwells and existing partitions and erected new walls and barriers. These conversions rendered Unit B extremely dangerous because Defendant PHA's configuration allowed for smoke to travel rapidly to the bedrooms in the event of the fire on the second floor.

104.    On or around May 17, 2011, Vanessa McDonald, signed a lease with Defendant

PHA to rent Unit B, the four-bedroom apartment for herself, and five (5) of her children and grandchildren: Rosalee McDonald, Virginia Thomas, Quinsha White, Quintien Tate-McDonald, and Destiny McDonald.

105. On or around August 1, 2012, Vanessa McDonald signed a new lease agreement, executed by PHA Representative, Defendant Corley, listing six (6) occupants. This was the first and last time that Unit B was appropriately sized for the number of occupants, per PHA occupancy standards.

106. On or around March 2015, Defendant Corley completed Family Composition Change Forms, adding three (3) additional occupants: Natasha Wayne, DeKwan Robinson, and Shaniece Wayne.

107. On or around April 2015, the three (3) additional occupants were added to the April 1, 2012, lease, for a total of nine (9) occupants.

| Mbr Number - 3a | Last Name - 3b | First Name - 3c | Middle Initial - 3d | Birth Date - 3e | Sex - 3g | Relation - 3h | Citizen - 3i | Disabled - 3l | Race - 3n | Ethnicity - 3n | SSN - 3n | Alias Reg - 3p | Comm Service - 3q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Head of House 01 | MCDONALD | VANESSA | R | 11/22/1966 | F | Head Of Household | EC-Eligible Citizen | Yes | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 02 | WAYNE | NATASHA | J | 11/24/2013 | F | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 03 | MCDONALD | ROSALEE | N | 06/21/1968 | F | Other Adult | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 04 | WAYNE | SHANIECE | M | 11/07/2011 | F | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 05 | ROBINSON | DEKWAN | H | 06/24/2013 | M | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 06 | THOMAS | VIRGINIA | N | 08/16/1991 | F | Other Adult | EC-Eligible Citizen | Yes | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 07 | WHITE | QUINSHA | V | 01/30/2003 | F | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 08 | TATE - MCDONALD | QUENTIEN | T | 04/12/2005 | M | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 09 | MCDONALD | DESTINY | N | 10/26/2006 | F | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |

108. Defendant Corley knew or should have known that the three (3) additional occupants caused Unit B to be overcrowded in violation of Section 7.2–7.3 of the ACOP and PHA's Occupancy Guidelines.

109. Defendant Corley did not initiate a transfer of the occupants into a larger unit that would have allowed for safe accommodations under Section 7.2–7.3 and 15.3 of the ACOP and the PHA's Occupancy Guidelines.

110.     Had Defendant Corley complied with the ACOP and the PHA's Occupancy Guidelines, rather than enforce PHA's no-transfer policy, Rosalee McDonald and her three children, Quintien Tate-McDonald, Destiny McDonald, and DeKwan Robinson would have been transferred to a three (3) bedroom unit.

111.     The remaining five (5) occupants, Vanessa McDonald, her daughters, Virginia Thomas and Quinsha White, and Virginia Thomas' two children – Natasha Wayne and Shaniece Wayne would have remained in Unit B as it was appropriately sized to house these five (5) occupants.

112.     Alternatively, the nine (9) occupants could have been transferred to a six (6) bedroom unit which would have been suitable to house all the occupants.

113.     On or around August 2016, Vanessa McDonald signed a new lease, executed by PHA Representative, Defendant Moc, listing nine (9) occupants.

114.     Defendant Moc knew or should have known that the nine (9) occupants in a four-bedroom unit was overcrowded in violation of Section 7.2–7.3 of the ACOP and PHA's Occupancy Guidelines.

115.     Defendant Moc did not initiate a transfer of the occupants into a larger unit that would have allowed for safe accommodations under Sections 7.2-7.3 and 15.3 of the ACOP and the PHA's Occupancy Guidelines.

116.     Had Defendant Moc complied with the ACOP and the PHA's Occupancy Guidelines, rather than enforce PHA's no-transfer policy, Rosalee McDonald and her three (3) children, Quintien Tate-McDonald, Destiny McDonald, and DeKwan Robinson would have been transferred to a three (3) bedroom unit.

117.     The remaining five (5) occupants, Vanessa McDonald, her daughters, Virginia

Thomas and Quinsha White, and Virginia Thomas' two (2) children – Natasha Wayne and Shaniece Wayne would have remained in Unit B as it was appropriately sized to house these five (5) occupants.

118. Alternatively, the nine (9) occupants could have been transferred to a six (6) bedroom unit which would have been suitable to house all the occupants.

119. On March 20, 2017, the occupancy total was increased to eleven (11) occupants:

| Member Number – 3a | Last Name – 3b | First Name – 3c | Middle Initial – 3d | Birth Date – 3e | Sex – 3g | Relation – 3h | Citizen – 3i | Disabled – 3j | Race – 3k | Ethnicity – 3m | SSN – 3n | Alien Reg – 3p | Cod Exclu 3q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Head of House 01 | MCDONALD | VANESSA | R | 12/22/1986 | F | Head Of Household | EC-Eligible Citizen | Yes | 2-Black | NOT Hispanic or Latino | | | Exempt |
| Member Number 010 | MCDONALD | DESTINY | N | 10/29/2006 | F | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 011 | W. | R. | M | | M | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 02 | WAYNE | NATASHA | J | 11/24/2013 | F | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 03 | MCDONALD | ROSALEE | N | 05/21/1986 | F | Other Adult | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | Exempt |
| Member Number 04 | ROBINSON | J'KWAN | T | 01/24/2016 | M | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 05 | WAYNE | SHANIECE | M | 11/07/2011 | F | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 06 | ROBINSON | DEKWAN | H | 08/24/2013 | M | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 07 | THOMAS | VIRGINIA | F | 05/13/1991 | F | Other Adult | EC-Eligible Citizen | Yes | 2-Black | NOT Hispanic or Latino | | | Exempt |
| Member Number 08 | WHITE | QUINSHA | V | 01/30/2003 | F | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 09 | TATE - MCDONALD | QUINTIEN | T | 04/12/2008 | M | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |

120. Defendant Revell knew or should have known that the eleven (11) occupants in a four-bedroom unit was overcrowded in violation of Sections 7.2-7.3 of the ACOP and PHA's Occupancy Guidelines.

121. Based upon Section 7.3 of the ACOP and PHA's Occupancy Guidelines, the family was not appropriately sized for a transferred to a six (6) bedroom unit and would have been required to split up into two (2) separate units.

122. Had Defendant Revell complied with the ACOP and the PHA's Occupancy Guidelines, rather than enforce PHA's no-transfer policy, Rosalee McDonald and her four (4) children, Quintien Tate-McDonald, Destiny McDonald, DeKwan Robinson, and J'Kwan Robinson would have been transferred to a four (4) bedroom unit.

123. The remaining six (6) occupants, Vanessa McDonald, her daughters, Virginia Thomas and Quinsha White, and Virginia Thomas' three (3) children – Natasha Wayne, Shaniece

Wayne, and Janiyah Roberts would have been transferred to a five (5) bedroom unit in order to appropriately house these six (6) occupants.

124.    Between March 2017 and March 2019, three (3) additional occupants were added to the list of occupants on the lease for a total of twelve occupants.

125.    On or around February 25, 2019, and May 1, 2019, the tenants completed Applications for Continued Occupancy, handled by PHA Representative Defendant Revell. Defendant Revell incorrectly noted that there were seven occupants residing in Unit B on February 25, 2019, and that there were six occupants on May 1, 2019. This was incorrect, as the twelfth occupant was added to the lease on March 18, 2019.

| Member Number - 3a | Last Name - 3b | First Name - 3c | Middle Initial - 3d | Birth Date - 3e | Sex - 3g | Relation - 3h | Citizen - 3i | Disabled - 3j | Race - 3k | Ethnicity - 3m | SSN - 3n | Alien Reg - 3p | Comm Service - 3s |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Head of House 01 | MCDONALD | VANESSA | R | 11/22/1966 | F | Head Of Household | EC-Eligible Citizen | Yes | 2-Black | NOT Hispanic or Latino | | | Exempt |
| Member Number 010 | ROBERTS | JANIYAH | V | 10/09/2016 | F | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 011 | MCDONALD | DESTINY | N | 10/29/2008 | F | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 012 | W | R | M | | M | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 02 | WAYNE | NATASHA | J | 11/24/2013 | F | Youth Under 18 | LC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 03 | MCDONALD | ROSALEE | e | 06/21/1988 | F | Other Adult | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | Exempt |
| Member Number 04 | ROBINSON | J'KWAN | T | 01/04/2018 | M | Youth Under 18 | EC-Eligible Citizen | No | 3-Black | NOT Hispanic or Latino | | | |
| Member Number 05 | WAYNE | SHANIECE | M | 11/07/2011 | F | Youth Under 18 | LC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 06 | ROBINSON | DEKWAN | H | 08/04/2013 | M | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 07 | THOMAS | VIRGINIA | C | 05/16/1991 | F | Other Adult | EC-Eligible Citizen | Yes | 2-Black | NOT Hispanic or Latino | | | Exempt |
| Member Number 08 | WHITE | QUINSHA | V | 01/08/2003 | F | Youth Under 18 | LC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 09 | TATE - MCDONALD | QUINTIEN | T | 04/12/2005 | M | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |

126.    Had Defendant Revell complied with the ACOP and the PHA's Occupancy Guidelines, rather than enforce PHA's no-transfer policy, Rosalee McDonald and her four (4) children, Quintien Tate-McDonald, Destiny McDonald, DeKwan Robinson, and J'Kwan Robinson would have been transferred to a four (4) bedroom unit.

127.    The remaining seven (7) occupants, Vanessa McDonald, her daughters, Virginia Thomas and Quinsha White, and Virginia Thomas' four (4) children – Natasha Wayne, Shaniece Wayne, Janiyah Roberts, and R.W. would have been transferred to a five (5) bedroom unit in order to appropriately house these seven (7) occupants.

128.    Despite this error, Plaintiff's Decedents were granted continued occupancy in Unit

B, even though Defendant Revell knew or should have known that 12 total occupants caused Unit B to be overcrowded in violation of Section 7.2 of the ACOP and PHA's Occupancy Guidelines.

129.    Defendant Revell did not initiate a transfer of the occupants into a larger unit that would have allowed for safe accommodations under Section 7.2–7.3 of the ACOP and PHA's Occupancy Guidelines.

130.    In or around May 2021, the tenants completed an Application for Continued Occupancy, handled by Defendants Nguyen and Bilal, during which two additional occupants were added, for a total of fourteen (14) occupants.

131.    On or about August 30, 2021, Defendants Nguyen and Bilal authorized the recertification of Unit B to allow for the fourteen (14) occupants to remain in and occupy Unit B despite Guidelines prohibiting such.

| Member Number - 3a | Last Name - 3b | First Name - 3c | Middle Initial - 3d | Birth Date - 3e | Sex - 3g | Relation - 3h | Citizen - 3l | Disabled - | Race - 3k | Ethnicity - 3m | SSN - 3n | Alien Reg - 3p | Consular Service - 3s |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Head of House 01 | MCDONALD | VANESSA | R | 11/22/1966 | F | Head Of Household | EC-Eligible Citizen | Yes | 2-Black | NOT Hispanic or Latino | | | Exempt |
| Member Number 010 | WHITE | QUINSHA | V | 01/30/2003 | F | Full Time Student 18+ | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | Exempt |
| Member Number 011 | TATE - MCDONALD | QUINTIEN | T | 04/12/2005 | M | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 012 | ROBERTS | JANIYAH | V | 10/09/2018 | F | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 013 | MCDONALD | DESTINY | N | 10/29/2006 | F | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 014 | W | R | M | | M | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 02 | MAE WAYNE | NATASHA | J | 11/04/2013 | F | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 03 | ROBINSON | TANIESHA | c | 01/08/2018 | F | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 04 | ROBINSON | TIFFANY | J | 11/18/2019 | F | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 05 | MCDONALD | ROSALEE | o | 08/21/1988 | F | Other Adult | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | Exempt |
| Member Number 06 | ROBINSON | J'KWAN | T | 01/24/2016 | M | Youth Under 18 | EC-Eligible Citizen | No | 3-Black | NOT Hispanic or Latino | | | |
| Member Number 07 | WAYNE | SHANIECE | M | 11/07/2011 | F | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 08 | ROBINSON | DEKWAN | H | 08/24/2013 | M | Youth Under 18 | EC-Eligible Citizen | No | 2-Black | NOT Hispanic or Latino | | | |
| Member Number 09 | THOMAS | VIRGINIA | D | 08/19/1991 | F | Other Adult | EC-Eligible Citizen | Yes | 2-Black | NOT Hispanic or Latino | | | Exempt |

132.    Had Defendants Nguyen and Bilal complied with the ACOP and PHA's Occupancy Guidelines, rather than enforce PHA's no-transfer policy, Rosalee McDonald and her six (6) children, Quintien Tate-McDonald, Destiny McDonald, DeKwan Robinson, J'Kwan Robinson, Taniesha Robinson, and Tiffany Robinson would have been transferred to a five (5) bedroom unit.

133.    The remaining seven (7) occupants, Vanessa McDonald, her daughters, Virginia Thomas and Quinsha White, and Virginia Thomas' four (4) children – Natasha Wayne, Shaniece

Wayne, Janiyah Roberts, and R.W. would have been transferred to a five (5) bedroom unit in order to appropriately house these seven (7) occupants.

134.    At this crucial stage – the recertification – a determination as to the appropriateness of Unit B to house fourteen (14) occupants was to be taken by Defendants Nguyen and Bilal, pursuant to Section 15.8 of the ACOP.

**15.8   Occupancy Standards**

PHA will transfer resident families when the family size has changed and the family is now too large (under-housed) or too small (over-housed) for their unit.

Occupancy Standards transfers will be initiated by PHA when applicable household changes dictate the need for an occupancy standard transfer. Occupancy Standards transfers are mandatory for the resident. Over/under-housed status will be determined at the time of recertification/interim recertification.

PHA may elect not to transfer an over-housed family in order to prevent vacancies.

A family that is required to move because of family size will be advised by PHA that a transfer is necessary and that the family has been placed on the appropriate transfer list.

If a family opts for a smaller unit size than would normally be assigned under PHAs occupancy standards, PHA may require the head of household's signature on a lease amendment acknowledging and agreeing with the approved guideline exception.

To alleviate an overcrowding situation, PHA may consider initiating a Split Family Transfer. Split Family Transfers will be initiated by PHA as a means of addressing an overcrowding situation. Families that split into two (2) "new" families may be required to transfer to two (2) different units. In the event that a Split Family Transfer is identified by PHA as a means to address an overcrowding situation, the following conditions must be met:

- All members of the family must be listed on the most recent lease and recertification documentation;

- The family must be overcrowded;

- Both heads of household must be legally capable of executing PHA's dwelling lease;

- The original head of household and any members that will remain in that family must be eligible for Public Housing and must pass the transfer screening criteria; and

- The splitting family (new head of household and family members) must be eligible for Public Housing and must pass applicant screening criteria.

135.    It was incumbent upon Defendants Nguyen and Bilal to not act in the manner they did, which was to permit the clear, obvious, and dire safety issues that come with approving fourteen (14) individuals to occupy a four (4) bedroom unit.

136.    Defendants Nguyen and Bilal knew or should have known that fourteen total occupants caused Unit B to be overcrowded in violation of Section 7.2 of the ACOP and PHA's Occupancy Guidelines and HUD's HQS, Section 10.3.

137.    Pursuant to these regulations, Defendants Nguyen and Bilal were required to initiate a family transfer to a six-bedroom unit with an exception for two residents to sleep in the living room or a split family transfer to alleviate the dangerous overcrowding in Unit B.

138.    Defendants Nguyen and Bilal did not initiate a transfer of the occupants into a larger

unit that would have allowed for safe accommodations under Section 7.2 of the ACOP and the PHA's Occupancy Guidelines.

139.    In any of these scenarios, had the PHA Defendants adhered to and complied with the policies, regulations, and protocols set forth by Defendant PHA or by HUD, rather than enforce PHA's no-transfer policy, R.W., a minor resident of Unit B, would never have resided in Unit B at any point in his life.

140.    Vanessa McDonald and others made repeated requests to Defendant PHA for a transfer to a larger unit due to the severe overcrowding of the family in the apartment and the fact that the family was plainly "underhoused" by PHA's standards.

141.    At all relevant times, Defendant PHA knew of the severe overcrowding in Unit B and the need for additional and/or larger housing.

142.    Over the course of their tenancy in Unit B, Plaintiff's Decedents were repeatedly subjected to rodent and bug infestations, severe overcrowding, lack of operable smoke detectors, and overall deplorable and unsafe living conditions.

143.    During Plaintiff's Decedents' tenancy, Unit B consistently received failing scores following its HUD required REAC inspections.

144.    On or around May 20, 2015, Defendant PHA conducted a REAC inspection of Unit B. As a result of the inspection, Unit B received a score of zero for the non-health and safety deficiencies category in the common areas. There were so many deductions that the area would have received a negative number score if such a score was possible. However, HUD does not permit negative number scores so a score of zero was given instead. This is the worst possible safety score that can be given as part of a HUD REAC inspection.

145.    During this May 2015 REAC inspection, the inspector noted missing/inoperable

smoke detectors among the Building's many deficiencies.

146.    On July 7, 2017, Unit B *again* received a score of zero for safety because a negative score could not be given. Violations included multiple smoke detector violations, including in the basement; first floor hall; second floor hall; second floor-second bedroom; second floor-third bedroom; and second floor-fourth bedroom. Unit B also received a violation for roach infestation.

147.    Upon information and belief, in or around October 2021, one or more smoke detectors in Unit B began to malfunction and sound false alarms when there was no smoke present.

148.    Upon information and belief, in or around October 2021, other smoke detectors in Unit B became inoperable due to malfunctions.

149.    On or about September 28; October 20 and 26; and November 1, 8, 15, 16, and 17, 2021, PHA maintenance workers responded to maintenance requests in Unit B.

150.    Upon information and belief, during one or more of these visits between September–November 2021, PHA employees removed some of the smoke detectors from Unit B but never returned to replace the removed detectors.

### Department of Human Services Family Support

151.    DHS is an agency of Defendant City of Philadelphia that exists, in part, to provide child welfare and juvenile justice services with a goal to provide and promote safety, permanency, and well-being for children.

152.    At all material times relevant hereto, Defendant City of Philadelphia, directly and through its duly authorized employees, agents, workers, and/or representatives, of DHS inspected Unit B for safety, including but limited to, the function and operability of its smoke detectors.

153.    At all material times relevant hereto, Defendant City of Philadelphia acted by and through its duly authorized employees, agents, workers, and/or representatives of DHS acting

within the scope of their employment.

154.    In or around December 2021, DHS received a report regarding child Shaniece Wayne missing a dental appointment. Following the report, DHS made two (2) safety visits to Unit B, meeting with Shaniece Wayne's mother, Virginia Thomas, and her children.

155.    Defendant Fulton conducted home safety visits on December 10, 2021 and December 21, 2021.

156.    During her December 10, 2021 safety visit at Unit B, Defendant Fulton noticed that the smoke detectors were inoperable and concluded that they were inoperable due to dead batteries. Her note from that visit states that the smoke detectors were without batteries. Virginia McDonald stated she would purchase new batteries before Defendant Fulton's next visit.

157.    On December 10, 2021, the smoke detectors in Unit B were inoperable.

158.    On December 21, 2021, Defendant Fulton conducted a second safety visit. During that visit, Social Worker Fulton noted that the smoke detectors were checked again and, although batteries were present, the devices were still inoperable:

| 2. Safety Assessment, Decision and Plan (what actions occurred and why) : |
|---|
| The children appeared to be safe and well cared for during this visit. The home remained appropriate. SW will complete the PHMC application with Mother during the next visit for bedding. The children continue to sleep on the couches/floor. The smoke detectors were checked again. The batteries were present, but the device were still inoperable. The batteries were removed and inserted again without evidence of them working. It is uncertain if it were the batteries or the device itself that wasn't working. SW reported that she would bring new devices during the next visit. |

159.    On December 21, 2021, the smoke detectors in Unit B were inoperable.

160.    On December 21, 2021, Defendant Fulton affirmatively represented to the occupants of Unit B that she would obtain and return with working smoke detectors.

161.    Between December 21, 2021, and the deadly fire on January 5, 2022, Defendant Fulton never returned with the promised smoke detectors to Unit B, despite having affirmatively promised she would and despite knowing Unit B was overcrowded, filled with children, and

without working smoke detectors.

162.     The occupants of Unit B justifiably relied on Social Worker Fulton's promise to return with working smoke detectors and, therefore, did not replace the inoperable smoke detectors.

## PHA's Visits and Repairs in the Weeks Leading up to the Fire

163.     In the weeks leading up to the fire, PHA representatives went to the Property on at least three (3) occasions: December 8, 2021, December 13, 2021, and December 29, 2021. During each visit, it was reported that quality checks were performed on the smoke detectors and carbon monoxide detectors, and they were operable.

164.     Under PHA policy, whenever a PHA worker visits a property to perform a service order, the worker is required to complete a service order form. As part of completing a service order form, the PHA worker is required to confirm that the life-saving smoke detectors and carbon monoxide detectors are operable.

165.     If a PHA worker determines, while performing a service order, that a unit's smoke detectors are inoperable, and the PHA worker correctly completes the service order form by documenting that the smoke detectors are inoperable, Defendant PHA is then required to fix the smoke detectors within twenty-four (24) hours.

166.     As noted above, DHS's records indicated that there were no operable smoke detectors in Unit B nine (9) days earlier.

167.     However, Defendant PHA's Maintenance records falsely stated the opposite.

168.     On December 30, 2021, Defendants Samuel and Henry were dispatched to Unit B to restore service to the hot water heater. Upon information and belief, during the service visit, Plaintiff's Decedents and other occupants told Defendants Henry and Samuel that the smoke and

carbon monoxide detectors were not working.

169.    Defendants Samuel and Henry then falsely reported that they performed quality checks on the smoke and carbon monoxide detectors, which found the detectors to be operable, even though they had never performed quality checks, the detectors in Unit B were not operable, and other detectors had been removed by PHA.

| Quality checks | Yes | No | NA | |
|---|---|---|---|---|
| Chargeback | ☑ | ☑ | ☐ | |
| Smoke Detectors Inoperable | ☑ | ☑ | ☐ | |
| Carbon Monoxide Detectors Inoperable | ☑ | ☑ | ☐ | |
| Request Housekeeping Inspection | ☑ | ☑ | ☐ | |
| Request Extermination | ☑ | ☑ | ☐ | |

170.    Defendants Samuel and Henry never returned to replace the inoperable or missing smoke detectors that they had reported to be operable. Neither did any other employee of Defendant PHA returned to replace those inoperable and missing smoke detectors.

171.    As DHS had confirmed on December 10, 2021, and then again on December 21, 2021, the smoke detectors were still inoperable on January 5, 2022 when the fire occurred in Unit B resulting in the death of Plaintiff's Decedents and serious injuries to Plaintiff.

172.    Had Defendants Samuel and Henry properly reported that the smoke detectors were inoperable, this report would have triggered the twenty-four (24) hour emergency repair per Defendant PHA's policy, which would have required the smoke detectors to be repaired within twenty-four (24) hours of them being reported inoperable.

173.    By falsely documenting that the smoke detectors were operable, Defendants Samuel and Henry prevented other PHA property managers or maintenance employees from being prompted to schedule an emergency service order within 24 hours, as is required by PHA's

emergency repair policy.

174.    At the time of the fire, all fourteen individuals were inside Unit B, including minor R.W., DeKwan Robinson, Destiny McDonald, Janiyah Roberts, J'Kwan Robinson, Natasha Wayne, Quintien Tate-McDonald, Quinsha White, Rosalee McDonald, Shaniece Wayne, Taniesha Robinson, Tiffany Robinson, Howard Robinson, and Virginia Thomas.

175.    Had Unit B been equipped with the required operable smoke detectors, Plaintiff's Decedents and Plaintiff would have had an early warning of the fire and been able to escape before the fire rendered Unit B inescapable.

176.    Fire and smoke spread throughout Unit B during the January 5, 2022, fire. The fire and smoke killed DeKwan Robinson, Destiny McDonald, Janiyah Roberts, J'Kwan Robinson, Natasha Wayne, Quintien Tate-McDonald, Quinsha White, Rosalee McDonald, Shaniece Wayne, Taniesha Robinson, Tiffany Robinson, and Virginia Thomas.

### PHA's Installation and Maintenance of Prohibited 9-Volt Battery–operated Smoke Detectors

*Philadelphia Code Governing Detectors*

177.    The Building, in accordance with Philadelphia Building Code is designated as R-2 or R-3 pursuant to 2018 International Building Code.

178.    Accordingly, the following applies:

F-907.2.11.2 Groups R-2, R-3[,] and R-4 [and I-1]. Single or multiple-smoke alarms shall be installed and maintained in Group R-2, R-3[,] and R-4 [and I-1] regardless of occupant load at all of the following locations:

    1.      On the ceiling or wall outside of each separate sleeping area in the immediate vicinity of bedrooms.
    2.      In each room used for sleeping purposes. [Exception: Single- or multiple-station smoke alarms in Group I-1 shall not be required where smoke detectors are provided in the sleeping rooms as part of an automatic smoke detection system.]

3.      In each story within a dwelling unit, including basements but not including crawl spaces and uninhabitable attics. In dwellings or dwelling units with split levels and without an intervening door between the adjacent levels, a smoke alarm installed on the upper level shall suffice for the adjacent lower level provided that the lower level is less than one full story below the upper level.

F-908.7.3 Location. A carbon monoxide alarm shall be installed within 15 feet of the entrance to every bedroom or within 15 feet of a bed in sleeping areas where there is no enclosed bedroom. It shall be centrally located on a wall or the ceiling, but not directly in front of a door to a bathroom or within 5 feet of a cooking appliance, to prevent false alarms. (Mounting the alarm at eye level accommodates reading the digital display, if the device is so equipped, and changing batteries.) If the alarm is a combination smoke and carbon monoxide alarm, it shall be located in accordance with the installation requirements for smoke alarms.

179.    The Philadelphia Building Code required each bedroom of Unit B to be equipped with a smoke detector – in addition to the requirement that smoke detectors be present on each floor of Unit B.

180.    Further, the Philadelphia Building Code required carbon monoxide detectors to be installed on both Floor Two and Floor Three of Unit B.

### *HUD Policy Concerning Detectors*

181.    HUD defers to local code and/or NFPA regulations on specific smoke alarm requirements but stipulates one smoke detector (hardwired or battery operated) on each level of each HUD rental dwelling unit.

182.    A The NFPA regulation in effect at the time of the fire states:

**29.7.1 Required Detection.**

**29.7.1.1\*** Where required by other governing laws, codes, or standards for a specific type of occupancy, listed carbon monoxide alarms or detectors shall be installed as follows:

(1) Outside of each separate dwelling unit sleeping area, within 21 ft (6.4 m) of any door to a sleeping room, with the distance measured along a path of travel

(2) On every occupiable level of a dwelling unit, including basements, excluding attics and crawl spaces

(3) In all sleeping rooms and guest rooms containing installed fuel-burning appliances

(4) Other locations where required by applicable laws, codes, or standards

**29.7.1.2\*** Each alarm or detector shall be located on the wall, ceiling, or other location as specified in the manufacturer's published instructions that accompany the unit.

**29.7.2 Carbon Monoxide Alarm Interconnection.** Unless exempted by applicable laws, codes, or standards, carbon monoxide alarms used to provide a warning function, and where two or more alarms are installed within a dwelling unit, suite of rooms, or similar area, shall be arranged so that the operation of any carbon monoxide alarm causes all carbon monoxide alarms within these locations to sound.

**29.8 Detection and Notification.** The use of fire alarm system smoke detectors and notification appliances shall be permitted to meet the fire-warning requirements for smoke alarms specified in 29.8.1.

**29.8.1\* Required Smoke Detection.**

**29.8.1.1\*** Where required by other governing laws, codes, or standards for a specific type of occupancy, listed single- and multiple-station smoke alarms shall be installed as follows:

(1)\* In all sleeping rooms and guest rooms

(2)\* Outside of each separate dwelling unit sleeping area, within 21 ft (6.4 m) of any door to a sleeping room, with the distance measured along a path of travel

(3) On every level of a dwelling unit, including basements

(4) On every level of a residential board and care occupancy (small facility), including basements and excluding crawl spaces and unfinished attics

(5)\* In the living area(s) of a guest suite

(6) In the living area(s) of a residential board and care occupancy (small facility)

183.    HUD-owned properties require one smoke alarm on each level and one in each bedroom.

*Defendant PHA's Policy Concerning Detectors*

184.    At the time of the fire, Defendant PHA's policy relating to smoke detectors and carbon monoxide detectors – as released publicly – was as follows:

**4.10 Smoke Detectors**

*Is there a working smoke detector on each level? Do the smoke detectors meet the requirements of National Fire Protection Association (NFPA) Standard 74 or its successors (currently NFPA 72)? In units occupied by the hearing impaired, is there an alarm system connected to the smoke detector?*

› At least one battery-operated or hard-wired smoke detector must be present and working on each level of the unit, including the basement.

› Smoke detectors placed on wall must be placed between 4″ to 12″ from ceiling.

› Smoke detectors on ceilings must be placed more than 4″ from wall.

› Do not place smoke detectors in or near kitchens,



- bathrooms, or supply registers of a forced air heating or cooling system.
- Place smoke detectors in hallways adjacent to bedrooms.
- In rooms with ceiling slopes more than one foot of rise per eight feet, the detector must be on the high side of the room.
- A smoke detector in a stairwell must be placed to ensure that smoke rising in the stairwell cannot be prevented from reaching the detector because of an intervening door or obstruction.
- A smoke detector placed in a basement must be in close proximity to the stairway leading to the floor above.
- In basements, if joist are exposed, smoke detectors must be placed on the underside of the joist, not in between.
- Each detector must make an alarm that is clearly audible in all bedrooms over background noise with all intervening doors closed. Audibility is based upon the noise created by all household equipment that would be in operation at night (such as window air conditioners and room humidifiers).
- In new construction, if more than one detector is required, they must be arranged so that the operation of any detector will cause all other detectors to alarm.
- Hardwired smoke detectors must be on an unswitched portion of a branch circuit or on a dedicated branch circuit.
- If the unit is occupied by persons with hearing disabilities, smoke detectors must have an alarm system, designed for persons with hearing disabilities (strobe light smoke detector), in each bedroom occupied by persons with hearing disabilities.

185.    Defendant PHA's compliance with both the Philadelphia Building Code and HUD's Policy were non-existent.

186.    And this was not just confirmed by Defendant PHA's public statement regarding its policy – it was made clear when Defendant PHA personnel confirmed both a lack of knowledge as to Defendant PHA's policy coupled with the policy falling below the standard of the Philadelphia Building Code and HUD's Policy in their interviews shortly after the fire:

23. [(b)(6)/(b)(7)(C)] stated he didn't know how many detectors were in 869 N 23rd St, he stated he believes that PHA policy calls for one (1) in the common area, one (1) on the steps, and one (1) in the hallways within fifteen feet (15') of a bedroom. He stated he never saw that policy in writing.

***

28. [(b)(6)/(b)(7)(C)] stated there is supposed to be one (1) smoke detector on each floor, and one (1) carbon monoxide detector on each floor. He stated detectors are replaced if a bracket is found with no detector attached if the occupant can't provide the missing detectors. He stated missing smoke detectors the most common problem found during inspections.

187.    This was not just a misunderstanding by one PHA worker; rather, this was pervasive throughout PHA.

*Philadelphia Detector Requirements Post-2013*

188.    In 2013, City of Philadelphia Bill No.: 130250 was put into effect, which altered the types of smoke alarms required to be installed in one and two-family dwellings:

*F-907.2.3 Power source for smoke alarms. Single-station smoke alarms shall receive their primary power from the building wiring provided that such wiring is served from a commercial source and shall be equipped with a battery backup. Smoke alarms with integral strobes that are not equipped with battery backup shall be connected to an emergency electrical system. Smoke alarms shall emit a signal when the batteries are low. Wiring shall be permanent and without a disconnecting switch other than as required for overcurrent protection.*
*Exceptions:*

**City of Philadelphia**

BILL NO. 130250 continued                                    Certified Copy

*1. Smoke alarms are permitted to be solely battery powered with 10-year non-removable (sealed) batteries in existing one- and two-family dwellings built prior to January 1, 1988, where no construction is taking place.*

*2. Smoke alarms are permitted to be solely battery powered with 10-year non-removable (sealed) batteries in one- and two-family dwellings that are not served from a commercial power source.*

*3. Smoke alarms are permitted to be solely battery powered with 10-year non-removable (sealed) batteries in existing one- and two-family dwellings built prior to January 1, 1988, undergoing alterations or repairs that do not result in the removal of interior walls or ceiling finishes exposing the structure, unless there is an attic, crawl space or basement available which could provide access for building wiring without the removal of interior finishes.*

189.    Given the implementation of the above Ordinance, the type of smoke detectors that ***should*** have been installed post-2013 were 10-year non-removable (sealed) detectors.

190.    Yet in an interview shortly after the fire, a PHA worker confirmed the requirements of the Ordinance were not implemented:

25.    [(b)(6)/(b)(7)(C)] stated the PHA Vacancy Unit is installing new detectors in every bedroom when they change over a tenant or renovate an existing property. He stated they have both the 10-year battery detectors, 9-volt battery type detectors, and the hard wires/battery backup detectors on all the trucks. He said replacement type depends on what's available, but most new detectors are the ten-year battery ones.

191.    Much like its personnels' lack of knowledge regarding number and location of

detectors, this too was not just a misunderstanding by one PHA worker; rather, this was pervasive throughout PHA.

<b><u>ATF Report</u></b>

192.    The ATF conducted an investigation of the fire and produced a report detailing the circumstances of the fire.

193.    According to the ATF report, Philadelphia Firefighter Mcguigan stated he heard no alarms sounding from within the incident structure but added he heard an alarm sounding from a neighboring building.

194.    Per the ATF Report, the only smoke detector that was operable inside the Building was found in the stairwell to the basement – a location outside of Unit B, although it did not sound during the fire.

195.    Accordingly, every detector located or recovered within Unit B was inoperable and non-functional at the time the fire broke out.

196.    According to the ATF Report, multiple inoperable smoke detectors found to have been installed in Unit B were 9-volt battery-powered detectors prohibited by the Philadelphia Building Code.

<b><u>2015-2019 Strategic Planning</u></b>

197.    In 2014, Defendant PHA – through Defendants Jeremiah and Jordon – embarked on a Strategic Directions Plan for 2015 through 2019.[5]

198.    Strategic Priority #2 aimed at achieving "Excellence. In the Provision of Management and Maintenance Services to PHA Residents."[6]

---

[5] https://www.pha.phila.gov/wp-content/uploads/2021/12/2014_strategic_plan-web1.pdf
[6] *Id.*

199. Measures of success would be based – in part – on meeting or exceeding service order completion benchmarks for 98% or greater for all service orders and ensuring that all housing units and developments met or exceeded Uniform Physical Conditions Standards.[7]

200. As part of this Plan, PHA sought to "re-focus and strengthen ongoing sit-level comprehensive preventive maintenance activities, achieve continuous improvement in physical conditions as measured by inspection results, and work to improve efficiency and customer service...."[8]

201. Further, PHA sought to implement "initiatives to ensure that all residents are housed in appropriately sized units...."[9]

202. Strategic Priority #10 aimed to "Make PHA an Employer of Choice with an Accountable, Diverse, Trained, and Productive Workforce."[10]

203. PHA sought to achieve this through the implementation of "annual performance evaluations and follow up actions as needed for all employees."

204. Ensuring that every employee has the necessary training, tools, and other resources to do their jobs properly is the focus of this strategic priority.[11]

205. On an annual basis, PHA will establish and implement a training plan to build employee skills and capacity and will conduct thorough performance evaluations designed to provide employees with meaningful feedback on their job performance.[12]

---

[7] *Id.*
[8] https://www.pha.phila.gov/wp-content/uploads/2021/12/2014_strategic_plan-web1.pdf
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*

## 2016 PHA Office of Audit and Compliance Report

206.     In its Annual 2016 Office of Audit and Compliance Report, Defendant PHA noted that an employee was conducting personal business during work hours. In essence, while he/she was supposed to be working in his/her capacity as a PHA employee, the employee was conducting unrelated business. [13]

207.     An internal investigation revealed that the employee was altered various documents to appear that the employee completed his/her PHA assigned work timely.[14]

208.     The investigation also revealed that another employee was falsifying tenant records and documents.  The employee had been alleging that she was completing tenant recertifications; however, the documents were falsely altered and backdated.[15]

## 2020 PHA Office of Audit and Compliance Report

209.     In its Annual 2020 Office of Audit and Compliance Report, Defendant PHA noted that a longtime maintenance employee, while reporting and receiving payment for completing PHA work during his/her designated PHA schedule, was instead working during that time at his/her private contracting building.[16]

210.     It was further noted that the PHA employee falsely documented on his/her PHA timecard that he/her worked during his designated eight-hour work shift.[17]

211.     Nevertheless, the PHA Defendants continued to maintain a custom of employees fabricating records to falsely reflect that work was performed, when it had not been performed as reported.

---

[13] *Id.*
[14] https://www.pha.phila.gov/wp-content/uploads/2021/12/2014_strategic_plan-web1.pdf
[15] *Id.*
[16] https://www.pha.phila.gov/wp-content/uploads/2021/12/oac_accomplishments_report_2020.pdf
[17] *Id.*

## ABC's 2020 Report

212. The PHA Defendants were also on notice of their employees' custom of failing to properly inspect and repair inoperable smoke detectors.

213. In 2020, ABC local produced a segment titled "*Without Warning. Thousands of public housing facilities have failed inspection after inspection when it comes to smoke alarms. Is enough being done to make sure residents are safe.*"[18]

214. The segment was subtitled "*Tens of thousands living in Philadelphia-area complexes where inspectors found smoke detector problems from 2014 to 2019.*"

215. According to the report, "[HUD] inspectors have found failed smoke detectors or other life-threatening conditions over the last five years. Even more troubling: in 90% of those buildings, the legally-mandated follow-up inspections by the federal government were months, even years, behind schedule."[19]

216. The report further noted, "HUD flagged 71 out of 78 complexes run by the Philadelphia Housing Authority for failed smoke detectors or other potentially life-threatening conditions like gas leaks, exposed electrical wires, or blocked fire escapes."[20]

217. Despite the PHA Defendants' knowledge of the above customs, Defendants failed to correct the improper customs, promulgate policies to ensure PHA residents were safe in homes with operable smoke detectors, or adequately supervise and train PHA employees.

218. The PHA Defendants were additionally on notice due to other fires that occurred at Defendant PHA's properties due to Defendant PHA's failure to provide operable smoke detectors. In particular, they were on notice of fires that had occurred at Plymouth Hall, 5132 Irving Street,

---

[18] https://dig.abclocal.go.com/wpvi/without-warning-philadelphia/index.html
[19] https://dig.abclocal.go.com/wpvi/without-warning-philadelphia/index.html
[20] *Id.*

1421 North 8th Street, and 1904 Carpenter Street.

<u>**Prior PHA Fires**</u>

*Plymouth Hall*

219.    On October 7, 2004, a three-alarm fire occurred at Plymouth Hall, a four story, 70-unit apartment building for senior citizens with low to moderate income located in Philadelphia, Pennsylvania. Plymouth Hall was owned and operated by PHA.

220.    Prior to the fire, Zone # 1 of the fire alarm system was disconnected or bypassed by a PHA employee leaving 53 heat detectors, or 50% of the first-floor heat detection system nonfunctional.

221.    As a result, the heat detector circuit in Herman Nance's apartment failed, activation of the main fire alarm system was delayed, and the tenants were not timely warned.

222.    The fire, smoke, and soot contributed to injuries of many of the tenants and the deaths of three tenants: Herman Nance, Henrietta Alston, and Geraldine Thornton.

*5132 Irving Street*

223.    On January 19, 1979, a fire broke out at the residence of Jean Myers located at 5132 Irving Street in Philadelphia, Pennsylvania. PHA owned the property and failed to install smoke detectors. Jean Myers, suffering burns, escaped. Her five children died. Tanya Jones also died in the fire.

*1421 North 8th Street*

224.    On March 21, 1988, a fire occurred which completely damaged 1421 North 8th Street in Philadelphia, Pennsylvania due to PHA's failure to provide operable smoke detectors. Thelma Reed's personal property located was also damaged and destroyed in the fire.

225.    On April 30, 2007, at 1904 Carpenter Street in Philadelphia, Pennsylvania, a fire occurred. A five-year-old girl died as a result of the fire. The property was owned by PHA.

226.    No working smoke alarms were found inside the home.

## COUNT I
## CIVIL RIGHTS: *MONELL* CLAIM
### *Plaintiff v. Defendant PHA*

227.    The previous paragraphs are incorporated herein by reference.

228.    PHA Defendants' conduct as set forth above, pursuant to the policies and customs of Defendant PHA, violated Plaintiff and Plaintiff's Decedents' Due Process rights to life and liberty in the form of bodily integrity pursuant to the Fourteenth Amendment to the United States Constitution.

229.    PHA Defendants' conduct as set forth above, acting under color of state law, was recklessly, willfully, and deliberately indifferent to the health, safety, and well-being of Plaintiff and Plaintiff's Decedents, Tiffany Robinson, Taniesha Robinson, DeKwan Robinson, and J'Kwan Robinson, and was committed in conscious and deliberate disregard of the substantial and/or unjustifiable risk of causing harm to members of the public and to Plaintiff and Plaintiff's Decedents and was so egregious as to shock the conscience.

230.    PHA Defendants adopted policies and created and promoted a culture, custom, pattern, and/or practice within its organization to disregard and deliberately fail to enforce its own policies and/or implement policies that promoted life and safety amongst tenants, such as Plaintiff's Decedents.

231.    Among these policies, customs, patterns, cultures, and/or practices was the adoption of PHA's no-transfer policy, whereby PHA employees authorized leases of both

underutilized and dangerously overcrowded units, in violation of policies requiring the mandatory transfer of residents in dangerously overcrowded units via family or split-family transfer.

232.    Among these policies, customs, patterns, cultures, and/or practices was adopting a custom of installing 9-volt battery–operated smoke detectors that were not compliant with the Philadelphia Building Code.

233.    As mentioned throughout this Second Amended Complaint, PHA Defendants knew of the grave risks associated with overcrowding, fire hazards, and the lack of operable smoke detectors, and the serious dangers that the conditions posed to Plaintiff's Decedents within Unit B.

234.    As mentioned throughout this Second Amended Complaint, PHA Defendants knew that should a fire ignite in Unit B and the 14 occupants not be alerted of the fire by way of operable smoke detection systems, there would be an increased risk and high likelihood of death and/or bodily injury.

235.    Despite being armed with this knowledge, PHA Defendants disregarded the grave risks and did not take reasonable measures to the address them, but instead, PHA continuously allowed unsafe conditions, such as fire hazards, overcrowding, and lack of operable smoke detectors to exist within Unit B by failing to enforce its own policies and/or implement maintenance polices that addressed life threatening safety hazards.

236.    PHA Defendants' actions constituted a deliberate indifference to the rights and safety of Plaintiff's Decedents, as it did not adequately train and/or supervise its own Commissioners, Executive Director or other employees/representatives so as to ensure that polices regarding the maintenance against life-threatening conditions were enforced, implemented, and/or complied with it during unit inspections.

237.    PHA was aware that inadequate training and/or supervision of its own

Commissioners, Executive Director or other employees/representatives regarding the maintenance against life-threatening conditions, such as fire hazards, overcrowding, and lack of operable smoke detectors would increase the risk and likelihood that tenants would suffer serious bodily injury or death in the event of a fire.

238.     As a direct and proximate result of the violations of their civil rights, Plaintiff and Plaintiff's Decedents were caused to suffer catastrophic, debilitating injuries, and death as set forth above.

**WHEREFORE,** Plaintiff demands judgment against all Defendants, individually and/or jointly and severally, in excess of $150,000.00, exclusive of interest and costs, which sum includes all damages recoverable under 42 U.S.C. § 1983.

**COUNT II**
**CIVIL RIGHTS: STATE CREATED DANGER**
***Plaintiff v. Defendants PHA, Jeremiah, Jordon, Indala, Moc, Corley, Revell, Nguyen, and Bilal***

239.     The previous paragraphs are incorporated herein by reference.

240.     The PHA Defendants' conduct as set forth above, acting under color of state law, was recklessly, willfully, and deliberately indifferent to the health, safety, and well-being of Plaintiff and Plaintiff's Decedents, and was committed in conscious and deliberate disregard of the substantial and/or unjustifiable risk of causing harm to members of the public and to Plaintiff and Plaintiff's Decedents and was so egregious as to shock the conscience.

241.     The acts of intentionally misrepresenting – by Defendants Samuel and Henry in their reports – that missing or inoperable smoke detectors were operable, all while knowing that said detectors were not, are actions that shock the conscience.

242.     The harm caused to Plaintiff and Plaintiff's Decedents was foreseeable to PHA

Defendants and a direct result of their aforementioned conduct.

243.    Specifically, it was foreseeable that Defendants Samuel and Henry, knowingly, intentionally, deliberately, and willfully averring in their property checks that the smoke detectors in Unit B were operable, while being fully aware that the smoke detectors were either not inoperable was a clear and foreseeable harmful action that could and would result in life-saving devices not being present/operable to preserve the lives of Plaintiff and Plaintiff's Decedents, Tiffany Robinson, Taniesha Robinson, DeKwan Robinson, and J'Kwan Robinson.

244.    A relationship existed between the PHA Defendants and Plaintiff's Decedents such that they were foreseeable victims of the PHA Defendants' conduct, as opposed to being members of the public in general.

245.    Defendants PHA, Samuel, and Henry, acting under color of state law, affirmatively exercised their authority in a manner that created a danger to Plaintiffs' Decedents and/or used their authority in a way that rendered Plaintiffs' Decedents more vulnerable to danger than had the Defendants not acted at all. Such conduct includes falsely noting on their service order report that the smoke detectors were checked, and were operable, when they were not operable.

246.    By falsifying and deliberately affirming that the smoke detectors were properly operating, Defendants Samuel and Henry, placed Plaintiff's Decedents in a position where they were subjected to danger in the event of a fire taking place by foreclosing the operation of PHA's emergency repair policy, which would have operated to provide a replacement of the missing and inoperable smoke detectors within 24 hours.

247.    Defendants, PHA, Moc, Corley, Revell, Nguyen, and Bilal, acting under color of state law, affirmatively exercised their authority in a manner that created a danger to Plaintiffs' Decedents and/or used their authority in a way that rendered Plaintiffs' Decedents more vulnerable

to danger than had Defendants not acted at all. Such conduct included:

    a) requiring Plaintiff's Decedents to continue living in Unit B and to wait for Defendant PHA to approve and provide a transfer voucher, despite the existence of serious, continuing, and life-threatening violations;

    b) requiring that Plaintiff's Decedents to remain in Unit B, despite the fact that it was found to have multiple fire hazards, no operable smoke detectors, and other life-threatening violations;

    c) leasing Unit B to multiple residents exceeding the maximum occupancy guidelines pursuant to the Philadelphia Housing Authority Admission and Continuing Occupancy Policy and Occupancy Standards; and

    d) continuing to allow continued occupancy and to renew the leases to multiple residents, totaling fourteen (14) residents, for a four-bedroom apartment, exceeding the maximum occupancy guidelines pursuant to the Philadelphia Housing Authority Policy Handbook, Occupancy Standards.

248. By reauthorizing leases to Unit B, a four-bedroom apartment to fourteen individuals, pursuant to its no-transfer policy and in violation of Section 7.2 of the ACOP, and Defendant PHA's Occupancy Guidelines, Defendant PHA, through its representatives Defendants Jeremiah, Jordon, Indala, Moc, Corley, Revell, Nguyen, and Bilal, placed Plaintiff's Decedents in a position where they were subjected to danger in the event of a fire taking place.

249. Here, the PHA Defendants utilized their state power of being authorized and instill with the task of performing these necessary and vital quality checks on life-saving devices within Unit B.

250. The aforementioned affirmative conduct violated Plaintiff's Decedents' rights under the Fourteenth Amendment to the United States Constitution, remediable through 42 U.S.C. § 1983.

251.     As a direct and proximate result of the violations of their civil rights through the aforementioned affirmative acts, Plaintiff and Plaintiff's Decedents were caused to suffer catastrophic, debilitating injuries, and death as set forth above.

**WHEREFORE,** Plaintiff demands judgment against all Defendants, individually and/or jointly and severally, in excess of $150,000.00, exclusive of interest and costs, which sum includes all damages recoverable under 42 U.S.C. § 1983.

**COUNT III**
**CIVIL RIGHTS:** *MONELL* **CLAIM**
*Plaintiff v. City of Philadelphia*

252.     The previous paragraphs are incorporated herein by reference.

253.     Defendant City of Philadelphia's conduct as set forth above, acting under color of state law, was recklessly, willfully, and deliberately indifferent to the health, safety, and well-being of Plaintiff and Plaintiff's Decedents, Tiffany Robinson, Taniesha Robinson, DeKwan Robinson, and J'Kwan Robinson, and was committed in conscious and deliberate disregard of the substantial and/or unjustifiable risk of causing harm to members of the public and to Plaintiff and Plaintiff's Decedents and was so egregious as to shock the conscience.

254.     Pursuant to Defendant City of Philadelphia DHS's Safety Manual, there are a list of potential present danger threats, that require immediate protective action is to be taken. Such circumstances include life threatening living arrangements, such as fire hazards. However, Defendant City of Philadelphia DHS's Safety Manual does not provide clear guidance as to how to check for inoperable smoke detectors, and how to assist the family in obtaining operable smoke detectors.

255.     Defendant Fulton's conduct as set forth above, pursuant to the policies and customs of Defendant City of Philadelphia, violated Plaintiff and Plaintiff's Decedents' rights pursuant to

the Fourteenth Amendment to the United States Constitution, by *inter alia*:

a) failing to promulgate a policy, custom, or procedure that describes how employees, representatives, and/or agents are to perform home safety checks to ensure that children are safe, and the homes within which they live contain working and operable smoke detectors;

b) failing to define "fire hazard" in its Safety Manual or provide guidance to its employees, representatives, and/or agents as to significance of not having operable smoke detectors as it relates to a "fire hazard";

c) failing to train employees, representatives, and/or agents on how to perform home safety checks to ensure that children are safe, and that their homes contain working and operable smoke detectors;

d) failing to promulgate a policy, custom, or procedure that describes how employees, representatives, and/or agents are to communicate and work with other local government agencies, such as PHA, to ensure the children and families are not living in overcrowded homes;

e) failing to train employees, representatives, and/or agents on how to communicate and work with other local government agencies, such as PHA, to ensure the children and families are not living in overcrowded homes;

f) failing to train employees, representatives, and/or agents on how to properly document if smoke detectors are inoperable to ensure a 23-hour emergency repair of the smoke detectors; and

g) allowing a custom in which employees, representatives, and/or agents disregarded safety concerns such as a home having inoperable smoke detectors.

256. As a direct and proximate result of the violations of their civil rights, Plaintiff and Plaintiff's Decedents, were caused to suffer catastrophic, debilitating injuries, and death as set forth above.

**WHEREFORE**, Plaintiff demands judgment against all Defendants, individually and/or jointly and severally, in excess of $150,000.00, exclusive of interest and costs, which sum includes all damages recoverable under 42 U.S.C. § 1983.

**COUNT IV**
**CIVIL RIGHTS: STATE CREATED DANGER**
***Plaintiff v. Defendants City of Philadelphia and Nadine Fulton***

257.     The previous paragraphs are incorporated herein by reference.

258.     The City Defendants' conduct as set forth above, acting under color of state law, was recklessly, willfully, and deliberately indifferent to the health, safety, and well-being of Plaintiff and Plaintiff's Decedents, Tiffany Robinson, Taniesha Robinson, DeKwan Robinson, and J'Kwan Robinson, and was committed in conscious and deliberate disregard of the substantial and/or unjustifiable risk of causing harm to members of the public and to Plaintiff and Plaintiff's Decedents and was so egregious as to shock the conscience.

259.     The harm caused to Plaintiff and Plaintiff's Decedents was foreseeable to the City Defendants and a direct result of its aforementioned conduct.

260.     A relationship existed between the City Defendants and Plaintiff and Plaintiff's Decedents such that they were foreseeable victims of the City Defendants' conduct, as opposed to being members of the public in general.

261.     The City Defendants, acting under color of state law, through the conduct alleged above, affirmatively exercised their authority in a manner that created a danger to Plaintiff and Plaintiff's Decedents and/or used its authority in a way that rendered Plaintiff and Plaintiff's Decedents more vulnerable to danger than had Defendant Fulton not acted at all. Such conduct included:

a)   confirming that the smoke detectors were inoperable;

b) promising to return with operable smoke detectors to replace the inoperable smoke detectors; and

c) requiring and allowing Plaintiff and Plaintiff's Decedents to reasonably rely upon the representation that Social Worker Fulton would return with operable smoke detectors.

262. The aforementioned affirmative conduct violated Plaintiff and Plaintiff's Decedents' rights under the Fourteenth Amendment to the United States Constitution, remediable through 42 U.S.C. § 1983.

263. As a direct and proximate result of the violations of their civil rights through the aforementioned affirmative acts, Plaintiff and Plaintiff's Decedents were caused to suffer catastrophic, debilitating injuries, and death as set forth above.

**WHEREFORE,** Plaintiff demands judgment against all Defendants, individually and/or jointly and severally, in excess of $150,000.00, exclusive of interest and costs, which sum includes all damages recoverable under 42 U.S.C. § 1983.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff asks the Court to:

a. Order that Defendants be enjoined from further violations of PHA tenants' rights;

b. Enter judgment in Plaintiff's favor, against all Defendants;

c. Order Defendants be required to follow all federal, state and municipal laws, rules and regulations, both retroactively and prospectively, including the requirement to inspect every single public housing dwelling and test to determine whether the apartments, units, and buildings (and common areas of multiple dwellings) contain operable smoke detectors and carbon monoxide detectors and – if not – ensure that

replacement is made of the inoperable smoke detectors and/or carbon monoxide detectors;

d.  Order Defendants be required to follow all federal, state and municipal laws, rules and regulations, both retroactively and prospectively, including the requirement to inspect every single public housing dwelling and determine whether the apartments and units are not over-housed and are occupied in accordance with the Occupancy Standard for PHA;

e.  Order Defendant PHA retrain all of its employees as to proper standards and requirements for the inspections of smoke detectors and carbon monoxide detectors inside PHA properties;

f.  Order Defendant PHA retrain all of its employees as to proper standards and requirements for ensuring its properties are not over-housed and are occupied in accordance with the Occupancy Standard for PHA;

g.  Appoint an independent monitor to oversee PHA's compliance with its smoke detectors and carbon monoxide detectors inspection obligations;

h.  Award Plaintiff compensatory damages (well in excess of $150,000.00) against all Defendants (this includes but is not limited to all damages permitted under Pennsylvania's Survival and Wrongful Death Acts, including Plaintiff's Decedents' immense pain and suffering and the loss suffered by Plaintiff and Plaintiff's Decedents' loved ones);

i.  Award exemplary and punitive damages against all Defendants;

j.  Award such interest as the law permits;

k.  Award Plaintiff attorney fees and costs pursuant to 42 U.S.C. § 1988; and

l. Provide Plaintiff with such other and further relief as the Court deems just and equitable.

Respectfully Submitted,

**STROKOVSKY LLC**

By: _/ s / Jordan L. Strokovsky_

JORDAN L. STROKOVSKY, ESQUIRE

By: _/ s / Ian V. Gallo_

IAN V. GALLO, ESQUIRE[21]

***Attorneys for Plaintiff, Howard Robinson**, Individually and as Administrator of the **Estate of Tiffany Robinson**, Deceased; **Howard Robinson**, Individually and as Administrator of the **Estate of Taniesha Robinson**, Deceased; **Howard Robinson**, Individually and as Administrator of the **Estate of DeKwan Robinson**, Deceased; and **Howard Robinson**, Individually and as Administrator of the **Estate of J'Kwan Robinson**, Deceased*

Date: January 18, 2025

---

[21] Ian V. Gallo is *Of Counsel* at Strokovsky LLC and is handling this matter in an *Of Counsel* capacity. He is a Partner at Town Law LLC.